Finally, the Montana Supreme Court has shown drastically disparate and inconsistent treatment of this same issue. In *State v. Stedman,* 2001 MT 150, 306 Mont. 65, 30 P.3d 353 (2001), the Montana Supreme Court reversed a conviction of misdemeanor criminal mischief because in a trial *de novo* from a conviction in justice court the district court addressed the lower court conviction in its findings. In its decision vacating the defendant's conviction, the Court held that:

> A trial "de novo" means trying the matter anew, **the same as if it had not been heard before and as if no decision had been previously rendered.** See, e.g., ***Farmingdale Supermarket, Inc., v. U. S.,*** *(D.N.J. 1971), 336 F. Supp. 534, 536*; Blacks Law Dictionary 435 (6th ed. 1990). In its Findings and Opinion the District Court specifically referenced the Justice Court proceedings in several instances. First, the District Court noted that "the Justice Court, following trial, found [Stedman] GUILTY of the offense. He immediately appealed for a trial **de novo**." . . . The references by the District Court to the findings and conclusions of the Justice Court strongly suggest that the District Court was influenced by the decision of the Justice Court, and based on said comments, we cannot conclude that the District Court was not unduly influenced by the Justice Court proceedings. Thus, we conclude that Stedman was denied his constitutional and statutory right to a trial de novo in the District Court.

2001 MT 150 at ¶ 9, 306 Mont. at 67, 30 P.3d 355 (*emphasis supplied*).

In the instant case Judge Larson's findings were much more extensive and detailed than those in *Stedman* and the mandate of the Montana Supreme Court in its remand was clear:

> that in a capital case where the life of the defendant is at issue and error is found relating to the consideration of mitigating circumstances, the prudent course is to remand to a different

judge to assure that the mitigating and aggravating factors are considered without regard to a previously drawn conclusion.

*State v. Smith, supra* at 446, 863 P.2d at 1017.

Further, given the actions of Judge Larson in citing not only the Stratford findings, but also the prior death sentences, and his further actions in giving interviews to the media and attempting to cut the fees of defense counsel[2], any attempt to differentiate the foregoing from *Stedman* simply defies comprehension.

Clearly, then, not only are the findings of the Montana Supreme Court erroneous, but in reviewing its conclusions of law *de novo* as required by *Townsend*, the Respondent's motion for summary judgment should be denied and as will be further set forth below, the Petitioner's motion for summary judgment on this issue should be granted.

## 2. Claims 4 and 11 of the Amended Petition

In its brief addressing Claims 4 and 11 the Respondent states that "[t]he record shows that Smith has not been subjected to anything but an orderly and fair process and that there have been three sentencing hearings." Respondent's Brief at 21. Even a cursory examination of the record, however, shows that the Petitioner was brought before the Montana courts and sentenced to death four times and the "orderly and fair process" alleged by the Respondent is so infected with error and bias as to make any hope of due process virtually unachievable.

---

2

*See* discussion *infra.*

First, the Petitioner was initially represented by an attorney who did virtually no investigation and allowed his client to plead guilty on an uncorroborated confession and statements by a codefendant. He also withdrew his request for psychological examination after the Petitioner told him that he wanted to die and prior to the Petitioner's entry of plea and request for sentence of death and presented no evidence in mitigation at the first sentencing hearing.[3]

At his second hearing the Petitioner was denied access to his own psychiatrist, which resulted in the Ninth Circuit Court of Appeals vacating his sentence of death and remanding the case to the Montana courts. *See Smith v. McCormick, supra.*

Upon remand for resentencing, not only did the district judge fail to order an updated presentence report, he also engaged in conduct which resulted in Petitioner's counsel moving to have him disqualified for bias at the close of the hearing. *State v. Smith,* 261 Mont. 419, 426, 432, 863 P.2d 1000, 1004, 1008 (1993). As a result of the foregoing the Petitioner's third death sentence was reversed. Although the Montana Supreme Court did not address the issue of the Petitioner's claims of bias on the part of the sentencing judge, it nonetheless contrary to Montana law remanded to a different judge for yet another sentencing. *Id.* at 445-46, 863 P.2d at 1016-17.

---

[3] Although this court has heard and denied the Petitioner's claims of ineffective assistance of counsel raised in his initial Petition, this issue is still pending before the Ninth Circuit Court of Appeals.

Upon remand for the fourth sentencing, the case was assigned to a judge who had virtually no experience handling homicide cases and was from the same judicial district as the prior judge who was charged with bias.

A new presentence report was ordered, which resulted in a document being filed with the district court that was so rife with errors and bias that counsel for the Petitioner moved to have it stricken in its entirety. *See* States Exhibit at 476-490.

Notwithstanding the publicity attendant to the Petitioner's case, particularly with respect to its expense, the presiding judge allowed himself to be interviewed by the media while the instant case was still pending and before he issued his findings of fact and conclusions of law that once again sentenced the Petitioner to death.[4] As further evidence of his being influenced by the circus-like atmosphere surrounding the Petitioner's case, after sentencing the Petitioner to death the trial judge made a ham-fisted attempt to cut counsel's fees and expenses, which necessitated counsel's obtaining a supervisory writ to reverse his decision.

In its brief the Respondent argues that the Petitioner "relied almost exclusively on *Lackey v. Texas*, 514 U.S. (1995)," and further analogizes the Petitioner's claims to those of Duncan McKenzie. Respondent's Brief at 22-24. The Respondent further states that "Smith has not claimed that the State has set up a scheme to prolong the period of his incarceration or purposefully resentenced him in order to torment him." *Id.* at 23. It is respectfully

---

[4] A more detailed analysis of this issue is presented *infra*

PETITIONER'S BRIEF IN RESPONSE TO RESPONDENT'S
MOTIONS TO DISMISS AND FOR SUMMARY JUDGEMENT
AND PETITIONER'S CROSS-MOTION FOR SUMMARY JUDGMENT
Page 24

submitted, however, that both the foregoing statement and the Respondent's reference to *Lackey* and *McKenzie* completely miss the point of the Petitioner's arguments in support of these claims.

Both *Lackey* and *McKenzie* address solely the issue of the extended time a person spends on death row awaiting execution as cruel and unusual punishment. The Petitioner's claims reach beyond this issue and although they are couched in terms of both the Eighth and Fourteenth Amendments, as well as others, it is the failure of **the entire process** as evidenced by the actions of those who have been charged with providing the Petitioner with due process that constitutes the gravamen of the Petitioner's claims. Neither Messrs. Lackey or McKenzie were victims of a process which ostensibly claimed to provide a procedure free from the influence of prior errors and conclusions, yet in reality conflated those errors and conclusions, thus making it impossible for the Petitioner to obtain the due process to which he is entitled under the United States Constitution. In fact, Justice Leaphart in his concurrence in the Montana Supreme Court 's decision denying the Petitioner's direct appeal squarely addressed this issue:

> **In reviewing the amount of time that a defendant has spent on death row, a distinction should be drawn between the passage of time due to the mere filing of appeals and petitions and the passage of time attributable to the State's inability to impose the sentence in accordance with requirements of due process.** In other words, it is not sufficient to attribute the delay to our "standards of decency." That suggests that we, as a society, out of a sense of decency, have provided defendants with a procedure whereby they can challenge their sentences and, if they choose to do so, they must live with the resulting delay. Such a rationale places all the

blame for the delay at the feet of the defendant. This blame is misplaced, however, in a case such as this wherein the defendant has not only filed appeals, but has been successful in his federal court appeals. His success points to the fact that the blame properly rests with the State or the courts for having failed to appoint an independent psychiatrist and then having failed to prepare a new presentence investigation.

When a defendant is successful in his appeals, it cannot fairly be said that he is merely filing frivolous appeals in order to buy time. Rather, **it raises more serious questions as to how long a defendant can be expected to languish on death row while the State and the trial courts are afforded repeated opportunities to comply with due process.**

*State v. Smith,* 280 Mont. 158, 190, 931 P.2d 1272, 1291 (1996) (Leaphart, J.

concurring) (*emphasis supplied*).

Unlike Lackey and McKenzie, the Petitioner has prevailed in all of his appeals and, as noted above, any delays in this case are attributable to the inability of the State of Montana to sentence him in a manner that is not offensive to due process.

It is therefore respectfully submitted that genuine issues of material fact exist with respect to claims 4 and 11 of the Amended Petition and the motion for summary judgement on these claims should be denied.

### 3. Claim 5 of the Amended Petition

Although the Respondent states the law correctly with respect that there is no requirement for a state to establish a burden of proof, Respondent's Brief at 26-28, it is respectfully submitted that the United States Supreme Court's decisions in *Ring v Arizona*, 536 U.S. 584, 122 S.Ct. 2428 (2002) and *Blakely v. Washington,* 542 U.S. 296, 124 S. Ct. 2531, *rehearing denied* 542 U.S. 961, 125 S. Ct. 21 (2004) nullify the holdings in *Pulley v. Harris*, 465 U.S.

37, 104 S. Ct. 871 (1984) and *Zant v. Stephens*, 462 U.S. 862, 103 S. Ct. 2733 (1983) to the

extent that no burden of proof is necessary for factual findings pertaining to the imposition

of sentence.[5]

*Ring v. Arizona* held that findings of aggravating factors in a death penalty case must

be made by a jury, rather than a sentencing judge. 536 U.S. at 609, 122 S.Ct. at 2443. *Blakely*

*v. Washington*, however, extended the holding of *Ring* in that it holds that **any** factfinding

that results in the increase of a sentence must be found by a jury beyond a reasonable doubt.

As Justice Scalia noted in his opinion in *Blakely*:

> Whether the judge's authority to impose an enhanced sentence
> depends on finding a specified fact (as in *Apprendi*), one of
> several specified facts (as in *Ring*), or *any* aggravating fact (as
> here), it remains the case that the jury's verdict alone does not
> authorize the sentence. The judge acquires that authority only
> upon finding some additional fact.

542 U.S. at 305, 124 S. Ct. at 2538 *(emphasis in original).*

Even a cursory examination of the record in the instant case shows that Judge Larson

made extensive findings of fact **beyond his findings of the aggravating circumstances** in

order to allow him to impose the death sentence in the instant case. Although the finding of

aggravating circumstances made the Petitioner eligible for a death sentence, the sentence

---

[5] Although the United States Supreme Court decided in *Schriro v. Summerlin,* 542 U.S. 348, 124
S. Ct. 2519 (2004) that is decision in *Ring v. Arizona, supra,* was not retroactive, because of the much
broader holding of *Blakely*, it is submitted that despite the fact that *Shriro and Blakely* were decided on
the same day, the retroactivity of *Blakely* was not addressed and so it is further submitted that because of
its much wider holding *Blakely* establishes a "watershed rule " of criminal procedure and is thus
retroactive under *Teague v. Lane,* 489 U.S. 288, 109 S.Ct. 1060, *rehearing denied,* 490 U.S. 1031, 109
S.Ct 1771 (1989).

could not be imposed on this finding alone, absent additional factfinding at a sentencing hearing.

Thus, because Montana establishes no provision either for jury factfinding **or** for a judge making findings of fact beyond a reasonable doubt prior to the imposition of a sentence of death, summary judgment in favor of the Respondent is inappropriate on this claim and as will be further set forth below, summary judgment should be entered in favor of the Petitioner.

### 4. Claim 6 of the Amended Petition

In its argument in support of its motion, the Respondent refers extensively to the record of Judge Larson's findings. Of specific interest are the discussion of the district court's findings pertaining to the Petitioner's mental state. *See* Respondent's Brief at 35-37.

In its consideration of the issues of the Petitioner's mental and emotional state, the district court found that the Petitioner's evidence offered in mitigation neither established that he was suffering from an extreme mental or emotional disturbance or that his ability to appreciate the criminality of his conduct was impaired. *See* State's Exhibit at 30-34, Sentencing Order at 29-33.

Despite the fact that the State offered no evidence of its own addressing the Petitioner's mental and emotional state, the district court nonetheless dismissed the testimony of the three mental health professionals who testified on the Petitioner's behalf as having little or no weight. *Id.* Thus, the district court in essence discounted this testimony because it did not establish the statutory mitigating factors. This clearly was error.

*Penry v. State*, No. 74,445 2005 Tex. Crim. App. Lexis1620, although a jury sentencing,  addressed a situation analogous to that of the instant case. In *Penry* the jury was instructed to decide if the Defendant was mentally retarded. 2005 Tex. Crim. App. Lexis1620 at 5 and then was instructed to "consider whether any other mitigating circumstance or circumstances exist as defined herein." *Id.* at 6. The jury found that the Defendant was not mentally retarded and sentenced him to death.

In reversing the death sentence the Court of Criminal Appeals held that after deciding that the Defendant was not mentally retarded the jury may not have considered his mental impairment as an additional mitigating factor, even though it fell short of retardation. *Id.* at 6, 14.

In the instant case, in the face of no other evidence in the record other than the unconstitutional Stratford Findings,  the district court virtually dismissed the voluminous psychological evidence presented by the Petitioner in its finding that the Petitioner had not even met by a preponderance of the evidence the statutory mitigating factors of impairment and extreme emotional disturbance, yet later on claimed to have somehow "considered" this evidence in mitigation. *Compare* State's Exhibit at 30- 34 with State's Exhibit at 48-51.

This clearly creates and issue of material fact precluding entry of summary judgment on this claim.

### 5. Claim 7 of the Amended Petition

Because of its almost exclusively fact-based nature, it is respectfully submitted that Claim 7 is inappropriate for summary judgment at this stage of the proceedings and the motion pertaining to this claim should therefore be denied.

### 6. Claim 8 of the Amended Petition

As the Petitioner has noted in his argument addressing the Respondent's motion with respect to claims 4 and 11, by virtue of the prior proceedings, the publicity and its clear effect on the sentencing judge, the Petitioner's constitutional rights were clearly violated.

Of particular significance to the Petitioner were the actions of the sentencing judge in virtually dismissing all of the Petitioner's psychological evidence in the face of the inadmissible findings of Dr. Stratford, *see* discussion *supra* at III B. 1., and  in giving interviews with the media while the case was pending and then bowing to the pressure of the media regarding the expenses of the case by trying to hamstring counsel's attempt to represent the Petitioner on his appeal.

As a result of the extensive news coverage about the costs of the Petitioner's case the sentencing judge issued an order prohibiting counsel from traveling to meet with each other or the Petitioner to discuss the multifarious issues pertaining to the appeal and further cut the fees of Mr. Vernay, ostensibly because he was not "lead counsel," despite the fact that he was lead counsel on the appeal. As a result of this action, counsel sought and obtained a Writ of Supervisory Control from the Montana Supreme Court that reversed the trial judge's order pertaining to fees and travel. *See* Petitioner's Exhibits "A" and "B."

Counsel for the Petitioner did not become fully aware of the nature and extent of the situation pertaining to the publicity and the interviews of the judge until after the Petitioner had been sentenced and the record was transmitted to the Montana Supreme Court. Petitioner's counsel then attempted to have the case remanded to district court or to supplement the record on appeal so counsel could develop this claim. *See* Petitioner's Exhibit "C."

The Montana Supreme Court denied the Petitioner's motion but nonetheless addressed some of the newspaper articles in its decision without giving the Petitioner the opportunity to develop this claim. *State v. Smith, supra* at 1286; State's Exhibit at 97-98. Although the Court refers to these newspaper articles in its opinion, its reference is to those exhibits attached to the motion to supplement the record. The Petitioner was never given an opportunity to argue or develop this claim, which vitiates ¶ 22 of the Respondent's "Statement of Controverted Facts." It is respectfully submitted that the Montana Supreme Court's review of the exhibits submitted in support of a motion it denied **is not** a factual determination for purposes of the presumption of correctness under   § 2254(d), notwithstanding the holding of *Sumner v. Mata, supra* and the Respondent's claim that these facts are "uncontroverted."

In *Sumner* the facts  were markedly different, with the only similarity being that the issue was not raised in the trial court:

> Admittedly, the California Court of Appeal made the factual determinations at issue here and it did so after a review of the trial court record.  Nevertheless, it clearly held a "hearing"

within the meaning of § 2254 (d). Both respondent and the State were formally before the court. **Respondent was given an opportunity to be heard and his claim received plenary consideration even though he failed to raise it before the trial court.** After respondent presented his case to the state appellate court, that court concluded in a written opinion that "the facts of the present case" did not adequately support respondent's claim. Since that court was requested to determine the issue by respondent, we do not think he may now be heard to assert that its proceeding was not a "hearing" within the meaning of § 2254 (d).

449 U.S. at 546, 101 S.Ct at 768-69 (*emphasis supplied*).

In the instant case the Petitioner was neither given an opportunity to be heard, nor did his claim receive the plenary consideration afforded the Respondent in *Sumner v. Mata*. Instead, the Montana Supreme Court went outside the appellate record and considered facts **which it refused to allow the Petitioner to bring before it in his appeal**, thus preventing the Petitioner from fully arguing and developing this claim. This clearly falls under a number of the exceptions to the presumption of correctness in § 2254(d) set forth my Justice Rehnquist in *Sumner v. Mata, supra*.

Similarly, the state habeas court summarily dismissed the Petitioner's claim based upon the Montana Supreme Court's *ex parte* discussion of the claim in its decision dismissing the Petitioner's state habeas petition. *See* State's Exhibit at 128-130; Order and Rationale on motion to Dismiss at 6-7.

It is respectfully submitted that the Petitioner was entitled to develop his bias and prejudice claim in postconviction proceedings to investigate (a) the full context of Judge

Larson's interview with the media; (b) any other media contacts Judge Larson may have had; and (c) any discussions of the Petitioner's case with the prior sentencing judge, who was senior to him, from the same judicial district and whose office was on the same floor.

In *United States v. Microsoft*, 253 F.3d 34 (D.C. Cir. 2001) the United States Court of Appeals for the D.C. Circuit dealt with a similar issue regarding a trial judge giving interviews to the news media about a case pending before him.

The *Microsoft* Court was also presented with an issue that was not raised in the trial court below. 253 F.3d at 107-108. In addressing the issue of bias, the court noted that:

> Canon 3A(6) of the Code of Conduct for United States Judges requires federal judges to "avoid public comment on the merits of pending or impending" cases. Canon 2 tells judges to "avoid impropriety and the appearance of impropriety in all activities," on the bench and off. Canon 3A(4) forbids judges to initiate or consider *ex parte* communications on the merits of pending or impending proceedings.

*Id.* at 107.

Although the Court addressed and decided the bias claims on evidence that was not in the record, **it did so after allowing the parties to argue the issue on appeal** and because an evidentiary hearing was not requested by either of the parties. *See Id.* at 108. This is not the situation in the instant case. The Petitioner attempted to get his claims before the Montana Supreme Court but the court summarily dismissed them without allowing the Petitioner to argue his case.

It must be noted that the Petitioner **is not** asking this Court to decide the issue of Judge Larson's bias and/or influence by the media and other factors at this juncture. All the

Petitioner requests and submits is that since he has not been allowed to develop his claims on this issue in state court, that the Court deny the motion for summary judgment on this issue and allow discovery and an evidentiary hearing.

### 7. Claims 9 and 10 of the Amended Petition

The Petitioner abandons claims 9 and 10 of the Amended Petition and consents to the entry of judgment on these claims in favor of the Respondent.

### 8. Claim 12 of the Amended Petition

The Respondent argues that because the Petitioner initially rejected the plea agreement and asked to die, at which time his trial attorney withdrew his request to have the Petitioner examined by a psychiatrist, this somehow vitiates his claim of vindictive prosecution. The Respondent further argues that "confronting a defendant with the risk of more severe punishment following the rejection of a plea bargain cannot form the basis for a claim of prosecutorial vindictiveness." Respondent's Brief at 55(*citations omitted*). This assertion belies the facts of the case. The prosecution never sought or confronted the Petitioner with more severe punishment as a result of his decision not to take the plea offer. Instead, the Petitioner **asked** for more severe punishment, but subsequently changed his mind and instead requested that the plea offer be reinstated.

The only time the prosecution actively sought the death penalty was after the Petitioner prevailed in *Smith v. McCormick* in having his death sentence reversed. Thus, the assertion by the Respondent that *Adamson v. Ricketts*, 865 F.2d 1011 (9th Cir. 1988) is not apposite is incorrect. As the Court in *Adamson* noted:

No actual showing of malice or retaliatory motive is necessary to assert a vindictive prosecution claim. *Blackledge, 417 U.S. at 28; see also United States v. Burt, 619 F.2d 831, 836 (9th Cir. 1980)*. Rather, vindictiveness will be presumed when the circumstances surrounding the prosecutorial decision at issue create the appearance of vindictiveness. [*footnote omitted*] *United States v. Robison, 644 F.2d 1270, 1272 (9th Cir. 1981); see also United States v. Griffin, 617 F.2d 1342, 1347* (9th Cir.), *cert. denied, 449 U.S. 863, 66 L. Ed. 2d 80, 101 S. Ct. 167 (1980)* (mere appearance of vindictiveness may give rise to presumption sufficient to establish due process violation); *United States v. Groves, 571 F.2d 450, 453 (9th Cir. 1978)* ("it is the *appearance of vindictiveness* rather than *vindictiveness, in fact*, which controls") (emphasis in original). A presumption arises whenever "it reflects the very real likelihood of actual vindictiveness" on the part of the prosecution. *United States v. Martinez, 785 F.2d 663, 668 (9th Cir. 1986)* (quoting *United States v. Gallegos-Curiel, 681 F.2d 1164, 1167 (9th Cir. 1982)).*

865 F.2d at 1017-1018 (emphasis in original)

As in the instant case, wherein the prosecution did not decide to actively seek the death penalty until the Petitioner prevailed in having his original death sentence set aside, the *Adamson* Court noted that:

The circumstances surrounding the State's decision to seek the death penalty for Adamson clearly reflect the real likelihood of actual vindictiveness and thus give rise to a presumption of vindictiveness. The State sought the death penalty against Adamson for the very same conduct for which it had three years earlier found a lesser charge and a sentence of 48-49 years appropriate. *See Martinez, 785 F.2d at 669* (presumption of vindictiveness raised when the increased charges arise from the same nucleus of operative facts as the earlier charge); *Robison, 644 F.2d at 1272-73* (prosecutor's attempt to seek a heavier penalty for the same acts is inherently suspect). The same sovereign and the same set of facts were involved in both decisions. *Cf. United States v. Ballester, 763 F.2d 368, 370* (9th Cir.), *cert. denied, 474 U.S. 842, 106 S. Ct. 126, 88 L. Ed. 2d*

> *103 (1985)* (likelihood of prosecutorial abuse is diminished
> when a separate sovereign brings the increased charges);
> *Robison, 644 F.2d at 1272* (vindictive prosecution claim
> weakened when different facts and different sovereigns
> involved). Most importantly, the decision to file the increased
> charges directly followed Adamson's assertion of his
> constitutional right against self-incrimination. *[footnote omitted]*
> *See Blackledge, 417 U.S. at 27-28; United States v. Shaw, 655
> F.2d 168, 171-72 (9th Cir. 1981)* (appearance of vindictiveness
> shown by prosecutor increasing severity of charges after the
> defendant exercised a protected right). These circumstances
> create the appearance that the State, "faced with a disappointing
> result, act[ed] so as to 'up the ante for the defendant." *[footnote
> omitted]  Martinez, 785 F.2d at 669.* Thus, a presumption of
> vindictiveness is warranted in this case. *[footnote and citations
> omitted]*

*Id.* at 1018-1019.

Finally, the *Adamson* Court set forth the procedure that must be followed once a

presumption of prosecutorial vindictiveness is raised:

> Once the presumption of vindictiveness is raised, the burden
> shifts to the prosecution to rebut it by presenting evidence of
> independent reasons or intervening circumstances which
> demonstrate that the prosecutor's decision was motivated by a
> legitimate purpose. *Gallegos-Curiel, 681 F.2d at 1167; United
> States v. Thurnhuber, 572 F.2d 1307, 1310 (9th Cir. 1977)* (state
> has a "heavy burden of proving that any increase in the severity
> of the alleged charges was not motivated by a vindictive
> motive") (quoting *United States v. Ruesga-Martinez, 534 F.2d
> 1367, 1369 (9th Cir. 1976)* (footnote omitted)). Thus, the State
> must rebut the presumption that its reinstatement of the first
> degree murder charge and pursuit of the death penalty against
> Adamson was improperly motivated. . . .

*Id.* at 1019. *See also United States v. Clay,* 925 F.2d 299, 302 (9th Cir. 1991).

("Whether there is an appearance of vindictiveness is a question of fact."); *United States v.*

*Cady,* 955 F. Supp. 164 (N.D.N.Y 1997).

Further, the Respondent's claim that the State discovered additional facts after the plea agreement was rejected is totally unsupported by the record in this case, as no such additional facts have been set forth by the Respondent either in its brief, the exhibits filed with this Court, or its Statement of Uncontroverted Facts.

Based upon the foregoing, it is respectfully submitted that the findings of the Montana Supreme Court referred to in the Respondent's brief are not dispositive of this issue. Given the factual nature of this claim and the failure of the Respondent to overcome the presumption of vindictiveness at this stage of the proceedings, material issues of fact exist and summary judgment is therefore inappropriate.

**Claim 14 of the Amended Petition**

As was noted in Section III B. 1. *supra*, the Petitioner's counsel  introduced evidence at the hearing from three professionals pertaining to his mental state and use of drugs and alcohol. *See, e.g.,* State's Exhibit at 732-1095, Transcript at 202-559.

Irrespective of the fact that the Respondent introduced **no evidence whatsoever** pertaining to the Petitioner's mental state or use of drugs, the trial court dismissed the testimony of the Petitioner's experts as having little or no weight, while at the same time incorporating Dr. Stratford's findings into the record.

The fact that they were placed in one section of the district court's findings as opposed to another does not vitiate the fact that they are entitled to the same presumption of correctness that the Respondent has crowed so loudly about throughout the body of its brief. Clearly, then, given the fact that counsel for the Petitioner was not given the opportunity in any manner to address or rebut these findings prior to the district court's issuance of its order

sentencing the Petitioner to death, the Petitioner is entitled to relief on this issue and summary judgement is therefore inappropriate.

### 10. Claim 15 of the Amended Petition

This claim was brought before this Court in the Petitioner's original Petition for Habeas Corpus and the Court denied the claim. *See* Opinion and Order. July 19, 1988 at 17-19.

The Petitioner appealed this finding to the Ninth Circuit Court of Appeals, but because the 9th Circuit reversed on other grounds, it did not reach this claim and it is respectfully submitted that the Petitioner's *"Estelle"* claim is still pending before the Ninth Circuit Court of Appeals and the Petitioner will urge the Court to address it at the time it addresses this Court's denial of the Petitioner's claim of ineffective assistance of counsel. *See, Smith v. McCormick, supra* at 1163.

### 11. Claim 16 of the Amended Petition

The Petitioner originally submitted this claim based upon the decision of the United States Supreme Court in *Ring v Arizona*, 536 U.S. 584, 122 S.Ct. 2428 (2002), which overruled *Walton v. Arizona*, 497 U.S. 639, 110 S.Ct. 3047 (1990) and held that a jury, rather than a judge must make the finding of aggravating circumstances that make an offender eligible for the death penalty. In *Schriro v. Summerlin,* 542 U.S. 348,  124 S. Ct. 2519 (2004), however, the Supreme Court held that its decision in *Ring v. Arizona, supra,* was not retroactive.

Virtually all of the Respondent's argument addressing Claim 16 is based upon both an analysis under *Ring,* and the argument that because the Petitioner entered a plea of guilty to at least one offense, *i.e.,* aggravated kidnapping that resulted in the death of the victim, that made him eligible for the death penalty, the holding in *Ring* would not apply even if the decision was retroactive. *See* Respondent's Brief at 60-66.

It is respectfully submitted, however, that the United States Supreme Court's holding in *Blakely v. Washington,* 542 U.S. 296, 124 S. Ct. 2531, *rehearing denied* 542 U.S. 961, 125 S. Ct. 21 (2004) both broadens its holding in *Ring v. Arizona* and further makes the Respondent's argument irrelevant for the following reasons.

First, aside from the issue of its non-retroactivity, in *Ring* Justice Ginsburg specifically limited its holding to the determination of aggravating factors.

> Accordingly, we overrule Walton to the extent that it allows a sentencing judge, sitting without a jury, to find an aggravating circumstance necessary for imposition of the death penalty. See *497 U.S. at 647-649.* Because Arizona's enumerated aggravating factors operate as "the functional equivalent of an element of a greater offense," *Apprendi, 530 U.S. at 494, n. 19,* the Sixth Amendment requires that they be found by a jury.

536 U.S. at 609, 122 S. Ct. at 2443.

In *Blakely v. Washington*, however, Justice Scalia noted that "[w]hen a judge inflicts punishment that the jury's verdict alone does not allow, the jury has not found all the facts which the law makes essential to the punishment'." *Blakely v. Washington, supra* at 304, 124 S. Ct. at 2538

Based upon the foregoing, the Court extended the requirement for jury fact finding to **any** fact that will result in the imposition of an increased sentence:

> Whether the judge's authority to impose an enhanced sentence depends on finding a specified fact (as in *Apprendi*), one of several specified facts (as in *Ring*), or *any* aggravating fact (as here), it remains the case that the jury's verdict alone does not authorize the sentence. The judge acquires that authority only upon finding some additional fact.

*Id.* at 305, 124 S. Ct. at 2538 *(emphasis in original)*.

In applying the foregoing analysis to the facts of the instant case and assuming *arguendo* that the Respondent's argument with respect to the Petitioner's entry of a guilty plea as establishing the Aggravator is correct, **the entry of the plea does not result in the imposition of a sentence of death**. The finding of the aggravator only made the Petitioner death-eligible, and absent any additional factfinding a sentence of death could not have been imposed. Thus, pursuant to *Blakely* any additional findings of fact that resulted in the imposition of the Petitioner's death sentence had to be made by a jury, rather than by a judge as occurred in the instant case.

Also, because of the significance of the holding in *Blakely*, it is further submitted that the *Blakely* holding reaches far beyond that of the *Apprendi/Ring* cases and is therefore retroactive under the United States Supreme Court's decision in *Teague v. Lane, supra. See* 489 U.S. at 306-309, 109 S.Ct. at 1073-75.