GREGORY A. JACKSON
320 11th Ave.
Helena, MT 59620
Phone: 406-443-2140

DON VERNAY
1604 Golf Course Road SE
Rio Rancho, NM 87124
Phone: 505-892-2766

Attorneys for Petitioner

FILED
HELENA DIVISION
2006 JAN 5 PM 4 06
PATRICK E. DUFFY, CLERK
BY ____________________
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

| | |
|---|---|
| RONALD ALLEN SMITH,<br><br>Petitioner,<br><br>-vs-<br><br>MIKE MAHONEY, Warden, Montan State Prison,<br><br>Respondent. | Cause No. CV-86-198-M-CCL<br><br>PETITIONER'S STATEMENT OF GENUINE ISSUES AND UNCONTROVERTED FACTS |

COMES NOW the Petitioner in the above captioned cause, by and through undersigned counsel and pursuant to Local Rule 56.1 submits the following statement of genuine issues of material fact in opposition to the Respondent's Motion for Summary Judgment.

1. A genuine issue of material fact exists with respect to the failure and/or refusal by the Montana state courts to allow the Petitioner to develop his factual claims of bias in the state court proceedings.

A. The Petitioner attempted to supplement the record on appeal in order to argue his claims of bias on the part of the sentencing judge. Petitioner's Exhibit "A."

B. The Montana Supreme Court denied the Petitioner's motion and without allowing the Petitioner to argue the issue, nonetheless addressed it on appeal and upheld the state postconviction court's dismissal of this claim. *State v. Smith,* 280 Mont 158, 182, 931 P.2d 1272, 1286 (1996); *Smith v. State*, 2000 MT 327, ¶¶ 19-27, 15 P.3d 395, 398-399.

2. A genuine issue of material fact exists with respect to the trial court's summary rejection of the Petitioner's experts in the face of its adoption of the Stratford findings in its Findings of Fact, Conclusions of Law, Order and Judgment dated September 19, 1995.

A. The State of Montana presented no evidence to counter the testimony of the three experts called by the Petitioner to testify about his mental state. State's Exhibit at 475-527.

B. The district court made specific findings of fact pertaining to the testimony of Dr. Stratford and the prior death sentences. State's Exhibit at 2-14.

C. Without explanation the district court dismissed the Petitioner's expert testimony as having no weight. State's Exhibit at 2-84.

3. A genuine issue of material fact exists with respect to the matter of the trial judge giving *ex parte* interviews to the media while the Petitioner's case was pending and implying in those interviews and his subsequent actions against Petitioner's counsel that he had both been influenced by the content of the newspaper articles about the expense of the Petitioner's case and that he had further reached a decision prior to issuing his Findings of Fact, Conclusions of Law, Order and Judgment dated September 19, 1995.

A. *See* ¶ 1 A. *supra*.

B. *See* ¶¶ 23-27 *infra.*

4. A genuine issue of material fact exists with respect to the issue of vindictive prosecution on the part of the State of Montana.

A. Despite the claim by the Respondent that "additional facts" were discovered after the Petitioner initially rejected a plea agreement offering him a lesser sentence, no such additional facts have been set forth in the record of this case. *See, e.g.*, Respondent's Brief at 56, *State v. Smith, 931 P.2d*, 1272, 1276.

The Petitioner further sets forth the following uncontroverted facts in opposition to the Respondent's Motion to Dismiss and for Summary Judgment and in support of the Petitioner's Motion for Summary Judgment.

1. On February 24, 1983 the Petitioner entered guilty pleas to two counts of Aggravated Kidnapping and two counts of Deliberate Homicide. State's Exhibit at 12.

2. On March 21, 1983 a sentencing hearing was held and the Petitioner was sentenced to death. State's Exhibit at 12.

3. On April 11, 1983 the Petitioner filed a motion requesting the trial court to reconsider his death sentence and for the appointment of a psychiatrist. State's Exhibit at 12-13.

4. The trial court appointed Dr. William Stratford and ordered that he make certain factual findings, as well as a diagnosis of the Petitioner's mental state at the time of the offenses and further ordered that his report be filed with the court and provided to counsel for the Respondent and the Petitioner. State's Exhibit at 13.

5. On December 1, 1983 a second sentencing hearing was held and Dr. Stratford offered testimony pertaining to the Petitioner's mental state and use of drugs. State's Exhibit at 13.

6. On December 12, 1983 the Petitioner filed a motion for an additional psychiatric examination and on December 30, 1983 this motion was denied. State's Exhibit at 13.

7. On February 15, 1983 the trial court once again sentenced the Petitioner to death. State's Exhibit at 13.

8. In 1985 the Montana Supreme Court upheld the Petitioner 's first death sentence. *State v. Smith*, 705 P.2d 1087 (1985); *rehearing denied, State v. Smith*, 705 P.2d 1110 (1985); *cert. denied, Smith v. Montana,* 474 U.S. 1073 (1986) (*Smith I*).

9. On September 7, 1990 the Ninth Circuit Court of Appeals issued an opinion vacating the Petitioner's death sentence and remanding the case to the Montana court for the appointment of a psychiatrist and a new sentencing hearing and to the federal district court for a hearing on the Petitioner's claims of ineffective assistance of counsel. *Smith v. McCormick*, 914 F.2d 1153, 1158-59 (9th Cir. 1990); State's Exhibit at 14.

10. On January 14-15, 1992 the state district court held a third sentencing hearing. State's Exhibit at 14-15.

11. Over the objections of the Petitioner, Dr. Stratford testified for the Respondent at the January hearing. *State of Montana v. Ronald Allen Smith*, 863 P.2d 1000, 1004 (1993) (*Smith II*).

12. Immediately following the January, 1992 hearing counsel for the Petitioner filed a motion to disqualify Hon. Douglas Harkin, the presiding judge, based upon *ex parte* remarks the judge made about the Petitioner to Dr. Noell Hoell, the Petitioner 's psychiatrist *State of Montana v. Ronald Allen Smith*, 863 P.2d 1000, 1004 (1993) (*Smith II*).

13. On February 12, 1992 the district court, Hon. Robert Boyd presiding, held a hearing on the Petitioner 's motion to disqualify the presiding judge and on February 24, 1992 Judge Boyd entered an order denying the Petitioner 's motion. *State of Montana v. Ronald Allen Smith*, 863 P.2d 1000, 1004-1006(1993) (*Smith II*).

14. On Friday, March 13, 1992 Judge Harkin once again sentenced the Petitioner to death. State's Exhibit at 15.

15. On November 9, 1993 the Montana Supreme Court vacated the sentence of death imposed upon the Petitioner by the Eleventh Judicial District Court on March 13, 1992 and the Petitioner's case was once again remanded to the district court for the preparation of a current presentence report and for re-sentencing. *State of Montana v. Ronald Allen Smith*, 863 P.2d 1000, 1017 (1993) (*Smith II*).

16. Upon remand the Petitioner's case was assigned the case to the Hon. John W. Larson, a newly appointed junior judge from the same district as Judge Harkin, who shared office space with Judge Harkin and who had little, if any, experience in major criminal cases, particularly homicide cases.

17. Prior to this fourth sentencing hearing and pursuant to the Montana Supreme Court's remand, a presentence investigation was conducted and a report was prepared by Todd Denison, a recently hired probation officer whose qualifications and experience fell below the standards called for by the Department of Corrections. State's Exhibit at 15.

18. Based upon the content of the presentence report, which contained a recommendation of a sentence of death because the Petitioner had prevailed in all of his appeals counsel for the Petitioner filed a motion to strike the report. State's Exhibit at 15.

19. Following briefing, hearing and argument, the court ordered portions of the report stricken. However, the Petitioner's motion to strike the report was denied. State's Exhibit at 15.

20. At the sentencing hearing the State offered no independent evidence as to the Petitioner's mental state or to rebut any of the evidence pertaining to the Petitioner's mental state or other mitigating circumstances offered by the Petitioner. State's Exhibit at 475-527.

21. At no time during the sentencing hearing were the prior sentences of death imposed on the Petitioner referred to by the parties or the trial court. State's Exhibit at 475-527.

22. At no time during the sentencing hearing were the findings, report or prior testimony of Dr. Stratford mentioned or referred to by the parties or the trial court. State's Exhibit at 475-527.

23. Prior to and throughout the period during which the Petitioner and his counsel prepared for the May 1995 sentencing hearing the Petitioner's case received extensive pretrial publicity, all of which was critical of the Petitioner, his attorneys and the costs of preparing a defense on the Petitioner's behalf. Petitioner's Exhibit "A."

24. During the summer of 1995, after the May sentencing hearing, but prior to the September imposition of sentence, the media published a series of articles critical of the costs accrued in the Petitioner's case. Petitioner's Exhibit "A."

25. In preparation of the articles, one of the reporters attempted to interview both of the Flathead County district judges and Judge Larson. Petitioner's Exhibit "A."

26. Although neither of the Flathead County district judges would discuss the Petitioner's case, Judge Larson, the presiding judge, allowed himself to be extensively interviewed by the reporter regarding the costs and attorney's fees expended in the Petitioner's case, even though the case was still under submission. Petitioner's Exhibit "A."

27. During the course of his interview, Judge Larson made certain statements to the media pertaining to the costs of providing a defense on the Petitioner's behalf, to wit that he would "tighten down after sentencing," which had not yet occurred. Petitioner's Exhibit "A,"

28. On September 19, 1995, Judge Larson orally imposed the death penalty on Mr. Smith, and contemporaneously entered his written Findings of Fact, Conclusions of Law and Order. State's Exhibit at 2-83.

29. The Court concluded that two aggravating factors defined in Mont. Code Ann. §46-18-303 (5) and (7) were present. State's Exhibit at 2-83.

30. The court found that eleven separate and distinct mitigating circumstances had been established by a preponderance of the evidence. State's Exhibit at 2-83.

31. The court concluded that the mitigating circumstances were not sufficiently substantial to warrant leniency and imposed a sentence of death. State's Exhibit at 2-83.

32. In its findings of fact supporting the sentence of death, the trial court made specific findings of fact regarding the mental state of the Petitioner, the testimony, report and opinions of Dr. Stratford and the prior death sentences. State's Exhibit at 2-14.

33. On December 5, 1995 Judge Larson issued an order which *sua sponte* attempted to deny Mr. Vernay payment for hours he already worked on the Petitioner's behalf, to limit the hours Mr. Vernay could work on the Petitioner's case and to deny both counsel any travel monies to effectuate contact with the Petitioner in order to prepare his appeal. Petitioner's Exhibit "B."

34. On January 3, 1996 counsel for the Petitioner requested a Writ of Supervisory Control from the Montana Supreme Court and on January 9, 1996 the Supreme Court issued an order reversing Judge Larson's attorney fee ruling and allowing counsel travel time and travel expenses. Petitioner's Exhibit "C."

35. On March 13, 1996 counsel for the Petitioner filed a motion to remand the case to District Court for purposes of supplementing the record on appeal regarding the issue of Judge Larson's possible bias and influence by the media and the prior death sentences. Petitioner's Exhibit "A."

36. On April 9, 1996 the Montana Supreme Court denied the Petitioner's motion to supplement the record. Petitioner's Exhibit "D."

37. On December 13, 1996 the Montana Supreme Court issued a decision denying the Petitioner's appeal. *State v. Smith,* 280 Mont 158, 931 P.2d 1272.

38. On November 9, 1998 the Petitioner filed a Petition for Postconviction Relief in the Eleventh Judicial District Court of Montana setting forth four claims for relief, including the actions of the sentencing judge, the use of the Stratford reports and the repetitive sentencing of the Petitioner and further requesting an evidentiary hearing. State's Exhibit at 104.

39. On November 24, 1999 the District Court entered an order dismissing the Petitioner's claims. State's Exhibit at 124.

40. On December 14, 2000 the Montana Supreme Court issued a decision upholding the dismissal of the Petitioner's state petition for postconviction relief. *Smith v. State*, 2000 MT 327, 15 P.3d 395 (2000).

RESPECTFULLY SUBMITTED: January 5, 2006

Gregory A. Jackson
320 11th Avenue
Helena, MT 59601
(406) 443-2410

Don Vernay, Attorney at Law
1604 Golf Course Road SE
Rio Rancho, NM 87124
(505) 892-2766

Attorneys for the Petitioner

CERTIFICATE OF MAILING

I, Gregory A. Jackson, Attorney at Law, do hereby certify that on January 5, 2006 I served a copy of the foregoing document upon the following by mailing a true and correct copy thereof, postage prepaid and addressed as follows:

C. Mark Fowler
Assistant Attorney General
P.O. Box 201301
Helena, MT 59620-1301

Gregory A. Jackson, Attorney at Law



GREGORY A. JACKSON
Jackson and Rice
833 North Last Chance Gulch
Helena, MT 59601
(406) 443-2140

DON VERNAY
Attorney at Law
470 Electric Avenue
Big Fork, MT 59911

Attorneys for Defendant/Appellant

**IN THE SUPREME COURT OF THE STATE OF MONTANA**

Nos. 95-494 and 95-

---

**STATE OF MONTANA,**

Plaintiff and Respondent,

v.

**RONALD ALLEN SMITH,**

Defendant and Appellant.

---

**MOTION TO REMAND TO DISTRICT COURT OR IN THE ALTERNATIVE TO ALLOW SUPPLEMENTATION OF RECORD ON APPEAL**

---

Comes now the Appellant, Ronald Allen Smith, by and through his counsel of record Don Vernay and Gregory A. Jackson and hereby moves the Court to remand this case to the District Court for the purposes of supplementing the record on appeal or in the alternative to allow Appellant to supplement the record on appeal in this Court. Said motion is made upon the following grounds and for the following reasons:





1. Pursuant to § 46 -18-308 , MCA the judgment and conviction and sentence of death are subject to automatic review by this Court as provided for in 46-18-308 through 46-18-310.

2. §46-18-310, MCA provides that on appeal this Court shall, among other things, determine whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor.

3. In the District Court proceedings Appellant raised the issue of passion, prejudice and bias. That issue was raised in Smith's Motion To Strike And Supporting Memorandum dated January 24, 1995. The motion, specifically citing §46-18-310 (1) , MCA requested "that due to the highly inflammatory nature of the presentence report, the surrounding publicity and the unique procedural history of this case the court issue an order prohibiting the State of Montana from seeking the death penalty in this cause and that the Court impose a sentence other than death." That motion referred to certain publicity in support of the motion. The District Court denied that motion.

4. Since the filing of the motion and the decision thereon Counsel has become aware of publicity which occurred prior to the making of the motion. Additionally, since the District Court's decision on the motion but prior to the District Court's pronouncement of judgment and sentence , publicity continued--including public statements by the District Court Judge himself.

5. That as the issue of bias, passion, prejudice and other arbitrary factors was raised below, is an issue in this appeal, and is the subject of mandatory review by this Court the publicity referred to above is relevant and necessary for a fair and just determination of not only the above issue but the case as a whole. To deny the admission of these exhibits would be to deny this Court access to the "full picture" of the atmosphere surrounding the submission of this case.

6. The publicity which Counsel seeks to introduce in way of supplementing the record is appended hereto as Exhibit A and by this reference made a part hereof.

Elizabeth L Griffing, Assistant Attorney General, was contacted and due to a scheduled argument before the United States Supreme Court was unavailable to indicate

whether she had an objection to his motion. Jennifer Anders, the Assistant Attorney General handling Ms. Griffings matters, indicated that it is their office's policy to object to motions such as this.

DATED this 15th day of March, 1996.

JACKSON & RICE

By: ______________________
Counselors at Law
833 North Last Chance Gulch
Helena, MT 59601

**CERTIFICATE OF SERVICE**

This does hereby certify that on the 15th day of March, 1996, a true and correct copy of Defendant/Appellant Smith's Motion Motion to Remand To District Court or In the Alternative to Allow Supplementation of Record on Appeal, was hand delivered to the following:

STATE OF MONTANA

Elizabeth Griffing
Assistant Attorney General
Justice Department
215 Sanders
Helena, MT 59626

Mr. Tom Esch
Flathead County Attorney
P.O. Box 1516
Kalispell, MT 59911

**IN THE SUPREME COURT OF THE STATE OF MONTANA**

Nos. 95-494 and 95-

---

**STATE OF MONTANA,**

Plaintiff and Respondent,

v.

**RONALD ALLEN SMITH,**

Defendant and Appellant.

---

**ORDER TO ALLOW SUPPLEMENTATION OF RECORD ON APPEAL**

---

UPON MOTION OF Appellant, Ronald Allen Smith, by and through his counsel of record Don Vernay and Gregory A. Jackson to remand this case to the District Court for the purposes of supplementing the record on appeal or in the alternative to allow Appellant to supplement the record on appeal in this Court; and, the State having objected to the motion; and, further, it appearing not only that there is good cause appearing for the granting of Appellant's motion but that it is in the interests of justice :

IT IS ORDERED AND THIS DOES HEREBY ORDER that Appellant's motion to supplement the record on appeal is hereby granted and the exhibits attached to Appellant's motion are deemed as a part of and supplemental to the record on appeal herein.

DATED this___day of March, 1996.

CHIEF JUSTICE

the daily Int

70
HISTOR
HISTOR
HELENA

MONDAY
April 3, 1995

SERVING THE FLAT

# Lympus upset with justice's death row comments

By JO ANN SPEELMAN
The Daily Inter Lake

The idea that inmates who have spent years on death row may have been punished enough has District Judge Ted Lympus fuming.

"That's preposterous," said Lympus, a former county prosecutor. "The only reason they are on death row so long is because judges have granted those delays with all the appeals."

U.S. Supreme Court Justice John Paul Stevens recently suggested that a prisoner who had spent 17 years on death row might have had sufficient punishment. Stevens called on lower courts to examine whether executing a prisoner who has spent many years on death row violates the Constitution's prohibition against cruel and unusual punishment.

The question, Lympus said, is significant, because a prisoner spends an average of 10 years between sentencing and execution while appeals are heard at various court levels.

Lympus said if Stevens opposes the death sentence,

# U.S. moves to

By MARTIN CRUTSINGER
AP Economics Writer

WASHINGTON (AP) — The Clinton administration intervened on foreign currency markets to buy dollars today as the U.S. currency hit another postwar low against the Japanese yen.

Treasury Secretary Robert Rubin announced the dollar-buying effort in a brief statement that provided no details about how much in resources were used.

"We acted in the exchange markets overnight out of concern with recent movements in exchange rates," Rubin said.

The Treasury secretary repeated past assurances that the administration "believes a strong dollar is in America's interests and we remain committed to strengthening the fundamentals that are ultimately important to maintain a strong and stable currency."

While the official announcement provided no details, currency traders earlier had reported that both the United States and the Bank of Japan were buying dollars during Asian trading early today.

While the intervention briefly bolstered the dollar, the U.S. currency began slipping again in New York trading and at midmorning was trading below



are heard at various court levels.

Lympus said if Stevens opposes the death sentence, he should say so."But for a Supreme Court judge to raise the issue as he did opens the door for every death row inmate to appeal on that issue alone," he said.

Such a comment could be expected from inmates and their attorneys, said Lympus, but not from a justice.

Stevens, 74, said the court has allowed capital punishment in part because it serves social purposes of retribution and deterrence. He said English jurists have ruled that execution after an inordinate delay is unlawfully cruel.

"The death penalty isn't as much of a deterrent as it should be when the delays are so long," said Lympus, who successfully lobbied for the death penalty for confessed double murderer Ron Smith.

Smith's death sentences for the 1982 murders of two Browning men have been overturned three times. He is to be sentenced again in May.

Stevens' comment related to a Texas case in which a prisoner has been on death row since 1978. "After such an extended time, the acceptable state interest in retribution has arguably been satisfied by the severe punishment already inflicted," he said.

Lympus said continual appeals and delays frustrate the public and erode confidence in the justice system, are unfair to the victims and further burden taxpayers, while undermining the death penalty as a deterrent.

"I have always believed in what Thomas Jefferson said — that punishment has to be certain, swift and commensurate with the crime," said Lympus. "Without that, we don't have justice."

He pointed to convicted murderer Duncan Peder McKenzie Jr., whose appeals have delayed his execution eight times for the 1974 rape, kidnapping and murder of Conrad-area teacher Lana Harding.

District Judge Thomas McKittrick in Great Falls last week set May 10 for McKenzie to die by lethal injection, saying "This case has gone on for 21 years, and all cases should have closure."

Another round of appeals is expected to be filed in the case.

## Reflective moment

Jeff Russell and Don Fritz of Flathead Janitorial wash the reflective glass on the First Inters[...] building in downtown Kalispell Thursday. Russell said it would take his four-person crew ab[...] days to clean all the glass on the building. **(Inter Lake photo by Robin Loznak)**

# Holocaust survivor recalls trip to g[...]

*(EDITOR'S NOTE: In a suddenly brightening world 50 years ago, in the final throes of the war in Europe, the Allies began overrunning German concentration camps. Halina Grynsztajn Birenbaum, a Jew who survived some of the worst camps, recounted her story during a recent visit to mark the liberation of the infamous Nazi death camp at Auschwitz, Poland.)*

By MONIKA SCISLOWSKA
Associated Press Writer

WARSAW, Poland (AP) — There was silence in the gas chamber. Young Halina Grynsztajn was holding the hands of her sister-in-law, looking into her eyes, trying to imagine what death would be like and how it would come.

Frozen in horror, with 200 other naked Jewish women and girls, they waited all night for the Zyklon B gas to start hissing through the sham shower heads.

"We knew it was the end," she recalled. "We knew nobody had ever left this place alive."

Thirteen-year-old Halina knew her mother had died two months earlier in the same gas chamber at the Nazi death camp at Majdanek.

At first, the women pounded on the heavy, iron doors that shut behind them. Then all was quiet. "When death is unavoidable, people accept it," said the woman, now Halina Birenbaum of Israel.

In the chamber, "suspended between hope and the unavoidable, we waited from one moment to another."

Hope won out that night in July 1943. The gas chamber doors suddenly swung open.

"There was no gas that night. They ran out of gas," she said simply, as if mentioning a temporary shortage of washing powder in a shop.

The women were immediately loaded into boxcars and sent to Auschwitz, the notorious death camp where from 1940 to 1945 German Nazis killed 1.5 million people, mostly Jews.

"The rescue from the gas chamber was Auschwitz," Mrs. Birenbaum said with bitter irony.

With prisoner number [illegible] tattooed in blue ink on her left forearm, she was sent to work in the warehouses, to sort belongings of those killed in the gas chambers.

It was a good job, she said matter-of-factly. She could smuggle out clothes or food for her dying sister-in-law.

But[...] old an[...] food [...] seeme[...] entire [...]

She [...] speech [...] word [...] much [...]

Shor[...] cer, [...] Ausch[...] tens of [...] Nazi [...]

Sen[...] Germ[...] was [...] 1945, [...]

The [...] saw [...] 15 year[...]

She[...]

# Friends and family of murder victims plan rally

KALISPELL (AP) — Friends and relatives of two Browning men who were killed in 1982 are upset that the murderer's death penalty has again been sidetracked, and they plan a Capitol rally to publicize their concerns.

"We've kept quiet so far, but now we want to try to raise the public awareness of what has happened," said David Running Rabbit.

The rally is to be in the Capitol rotunda sometime during the special legislative session that opens Monday.

Canadian Ron Smith killed Running Rabbit's brother, Thomas Running Rabbit Jr., 20, and his cousin, Harvey Mad Man Jr., 23, after they gave Smith and two companions a ride.

Smith in 1986

Smith, of Red Deer, Alberta, pleaded guilty and has been sentenced to death three times, but each sentence has been overturned on appeal. A few weeks ago, the state Supreme Court threw out the latest death sentence on grounds that the judge did not consider Smith's conduct in prison since the murders as a mitigating factor.

David Running Rabbit said the justice system has focused for 11 years on Smith instead of the victims.

"The justice system has failed three times, and it looks like it's setting itself up for a fourth time," he said. "It looks like there may not be a death sentence.

"If Smith gets a prison sentence instead, he may go to Canada to serve the time under an exchange program."

"The death penalty is the punishment that is appropriate for this crime," he said.

Several meetings already have been held in Browning, where the two young men lived. Running Rabbit's parents, Thomas Sr. and Katrina, as well as David and an older sister and younger brother, reside there. So do Thomas Jr.'s widow and his two sons and daughter.

Mad Man's father and two brothers also live in Browning. His mother died a year after her son was killed.

At his original sentencing in 1983, Smith, now 36, admitted to District Judge Michael Keedy that he had marched the victims into the woods west of Marias Pass and shot them. He explained that he wanted to know what it felt like to kill someone.

He asked to be executed, saying he could not face a lifetime in prison. Keedy gave him four death penalties, one for each kidnapping and each murder. Less than a month later, Smith changed his mind, claiming mitigating circumstances, especially his use of drugs and alcohol.

He asked for a psychological exam. The exam confirmed that he knew what he was doing when he murdered the men. Keedy sentenced Smith to death for the second time in February 1984.

Smith's case has been to the U.S. Supreme Court and back, and to the federal 9th Circuit Court of Appeals, which overturned the death sentences in 1986 and ordered further mental testing.

Subsequently, Missoula District Judge Douglas Harkin imposed the death sentences again. The case went back to the state Supreme Court, which automatically reviews all death sentences.



THE DAILY INTER LAKE, KALISPELL, MONTANA, SUNDAY, JANUARY 22, 1995

Inter Lake editorial

# Stalled justice

All anyone can do about the case of convicted killer Ron Smith, including the court, it seems, is sputter.

Smith, you remember, is the guy who deliberately shot and killed two young men on Aug. 4, 1982. At the time, Harvey Mad Man Jr. was 24; his cousin, Thomas Running Rabbit Jr., was 20. They had picked up Smith and his two hitch-hiking companions along U.S. 2 near Marias Pass. An hour later, Smith had marched the two Browning men into the woods and executed them.

He first ordered one of his hitch-hiking companions to stab Mad Man, then shot the wounded man in the head. He reloaded the pistol, thrust it into Running Rabbit's face to let him get a good look at it, then pulled the trigger again.

Smith never denied the killings. He once told court officials he did it because he wanted to see what it felt like to kill someone. Three years ago, in court, in the presence of the young men's families, he said he shot them because he didn't want to see them suffer.

In 1983, Smith was sentenced to die for his crimes. The sentence was reaffirmed by the Montana Supreme Court. But a federal appeals court ordered a new psychological evaluation and a new sentencing by a new judge. It took place in March 1992, and that judge, too, decreed that Smith should die.

Smith, of course, appeals each new decision. And in an opinion that defies logic, the Montana Supreme Court majority decided that Smith deserved credit for behaving himself during the 10 years he had spent locked in prison fighting his death sentence. They disallowed the second death sentence and ordered a new hearing.

A third judge was to review all the evidence, including a new evaluation report, and sentence Smith again Jan. 30. But Smith is not happy with the pre-sentence report done by a state probation and parole officer. So the sentencing has been delayed to give Smith and his attorney an opportunity to make their objections.

Smith was 24 when he murdered Harvey Mad Man and Thomas Running Rabbit. He is 37 now. In the intervening years, several of the victims' family members have died without seeing justice done.

No one expects this court appearance to be the last, either, unless Smith finally wins his fight for a lesser sentence. Judges come and go. Smith has outlasted a couple of attorneys and several district court judges and state Supreme Court justices.

For a dozen years the legal maneuvering has gone on. Smith has not begun to exhaust his appeals — only our patience.

And we can only look on in absolute, total frustration as we watch our ponderous justice system sputter and slacken and stall.

THE DAILY INTER LAKE, KALISPELL, MONTANA, SUNDAY, JANUARY 12, 1992

## Inter Lake editorial

# Killer has exhausted his measure of mercy

Ron Smith has lived about nine years and five months longer than he deserves to live.

Smith killed two college students one summer day in 1982 on the edge of Glacier National Park. He put a sawed-off .22 to the back of one man's head and pulled the trigger. Then he reloaded the single-shot rifle, held it so the other man could get a good look at it pointing at his head, and pulled the trigger again.

The only thing his victims had done wrong was trust Smith enough to give him and his hitchhiking pals a ride.

Months later, in jail, Smith told reporters, "It never bothered me to take the first two lives, and it wouldn't bother me to kill again."

But it bothers the hell out of him that he might die for the two murders. Each time his own date with the executioner comes and goes, Smith's esteem for good old American justice rises another notch.

"The idea of freedom is real compelling," he told a reporter last year.

It was so compelling nine years ago that he killed two men so there'd be no witnesses when he stole their car. So compelling, he said back then in jail, "it wouldn't bother me to kill again."

The thought of killing anyone bothers most civilized people — bothers them a great deal. But Ron Smith is bothered only when he contemplates his own death.

He executed two men without hesitation. Our justice system has hesitated nine years so far, and next week if Smith is again sentenced to die, the case will start a new journey through state and federal courts.

Some will argue for mercy. But were it not for a merciful court system, Smith would be nine years dead by now — like his victims.

Society's capacity for mercy knows limits, and Smith has spent his quota.

Sunday, January 7, 1996 7

OP

Inter Lake editorial

# Justice overdue

Job would learn a thing or two about patience if he'd had to follow the excruciating case of convicted killer Ron Smith, as folks around here have for a dozen years now.

Smith, who marched two young men into the woods and murdered them back in 1982, has four times been sentenced to die for his crimes. There is no question about his guilt; he's admitted it, and two eyewitnesses, Smith's companions at the time, confirm it. He's shown precious little remorse; at one point he even said he shot one young man, who'd been stabbed on Smith's orders, so that he wouldn't suffer.

He's stayed alive this long because of a procession of legal dodges and sidesteps, none of which changed a single fact about Smith's unmitigated guilt, and all of which make long-suffering, law-abiding people doubt the courts' will to carry out the sentence imposed by three separate judges.

Smith has had half a dozen attorneys plead his case. A handful of psychoanalysts have probed his past. He has had scores of court appearances. At least 15 judges have reviewed the facts, and not one has doubted Smith's guilt. And yet the case drags on.

Americans expect the accused to receive every consideration. But they also expect an eventual ending. What we've seen too much of in the Smith case is rehearings that produce no new evidence or insights, reviews that worry more about technicalities than guilt or innocence, and delays intended to thwart justice rather than secure it.

Just last week, Smith's attorneys asked for another 90 days to appeal his most recent death sentence, claiming that they have been "severely restricted and hindered" because they aren't being paid for travel. As if Smith had something to say not already contained in a mountain of transcripts 12 years in the making!

Somehow the system has lost its focus. The issue should not be attorney fees or travel expenses or meal tickets. The issue is simple justice.

For that we are still wating, with growing impatience.

# Judicial meddling usurping role of elected officials