IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MONTANA

MISSOULA DIVISION

*******

RONALD ALLEN SMITH,                          CV 86-198-M-CCL

       Petitioner,

-v-                                          <u>OPINION AND ORDER</u>

MICHAEL MAHONEY, Warden,
Montana State Prison,

       Respondent.


*******

     The cross-motions for summary judgment and motion to dismiss
now pending in this habeas case are ripe for ruling.  The Court,
having considered the briefs, reviewed the record, and heard and
considered the arguments of the parties, is prepared to rule.
First, the procedural background and the factual background of
this habeas petition are both described.  The Court will then
consider in turn each of the Claims advanced by the Petitioner's
Amended Petition in the context of the motions for summary
judgment and motion to dismiss.

     This Court has jurisdiction in this case pursuant to 28

U.S.C. § 2254.  The original petition for writ of habeas corpus
having been filed before the effective date of the Anti-Terrorism
and Effective Death Penalty Act of 1996 ("AEDPA"), the AEDPA does
not apply to the merits of the Amended Petition.  *Lindh v.
Murphy*, 521 U.S. 320, 327 (1997); *Alcala v. Woodford*, 334 F.3d
862, 868 (9th Cir. 2003).


Procedural Background

        This Court's decision of the pending motions for dismissal
and summary judgment will complete the current round of the
district court's judicial action in this case.  Another portion
of this case (Petitioner's ineffective assistance of counsel
claims) has been stayed while on appeal to the Ninth Circuit
Court of Appeals since 1994, and is awaiting today's decision for
simultaneous appellate review.

        The case itself began on August 4, 1982, when Harvey Mad
Man, Jr., and Thomas Running Rabbit, Jr., were murdered near
Glacier National Park in Montana.  Six months later, Petitioner
Ronald Allen Smith ("Smith") pleaded guilty to two counts of
deliberate homicide and two counts of aggravated kidnapping.  On

2

March 21, 1983, State District Judge Michael Keedy imposed a sentence of death on Smith.  The death sentence was based on the finding of an aggravating circumstance:  the offense was an aggravated kidnapping which resulted in the death of the victim. *See* Mont. Code Ann. § 46-18-303(7) (1995).  Judge Keedy denied Smith's motion for reconsideration on February 15, 1984.  The Montana Supreme Court affirmed the conviction and sentence on direct appeal in *State of Montana v. Smith*, 705 P.2d 1087 (1985), *cert. denied*, 474 U.S. 1073 (1986).

Smith's first motion for state post-conviction relief was denied by the Montana Supreme Court in an unpublished decision on August 14, 1986.  Smith filed his first habeas petition in federal court on October 10, 1986, and he amended the petition on March 3, 1987.  This district court denied the amended petition on July 19, 1988.

Following Smith's appeal, the Ninth Circuit Court of Appeals reversed the denial of the habeas petition, on September 7, 1990. *Smith v. McCormick*, 914 F.2d 1153 (9th Cir. 1990).  The Circuit panel remanded the case with directions that this Court hold an evidentiary hearing on the ineffective assistance of counsel

claims and also that this Court grant the writ unless the state
conducted a new sentencing hearing wherein a defense psychiatrist
had been provided to assist Smith.  As to this last point, the
Circuit panel found that pursuant to *Ake v. Oklahoma*, 470 U.S.
68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985), Smith's constitutional
right to a psychiatric expert was not satisfied by the state
court's appointment of a neutral psychiatrist.

    In response to the direction of the Circuit, this Court held
an evidentiary hearing on the ineffective assistance of counsel
claims and then filed its "Findings of Fact, Conclusions of Law,
and Order" on January 3, 1994.  Smith filed a Notice of Appeal on
January 6, 1994.  This Court issued a Certificate of Probable
Cause on January 19, 1994.

    Also in response to the direction of the Circuit, the state
resentenced Smith on March 13, 1992.  State District Judge
Douglas Harkin imposed a death sentence.  On direct appeal, on
November 9, 1993, the Montana Supreme Court reversed that
sentence because a new presentence report had not been prepared
and not all mitigating evidence had been properly considered.

    The Montana Supreme Court remanded Smith's case for a third

sentencing, which was held this time by District Judge John
Larson, on September 19, 1995.  This resulted in Smith's third
death sentence.  The Montana Supreme Court affirmed the sentence
on direct appeal on December 13, 1996.  The United States Supreme
Court denied certiorari on November 10, 1997.  Subsequently, the
Montana Supreme Court denied Smith's petition for post-conviction
relief on December 14, 2000.  The United States Supreme Court
denied certiorari on June 18, 2001.

Six months later, on February 1, 2002, Smith filed an
Amendment (16 Claims) to his original petition for writ of habeas
corpus.  Because Smith's federal habeas petition was then
currently on appeal to the Ninth Circuit, this Court required
Smith to obtain an order of limited remand for the purpose of
filing an Amendment to the Petition.  On March 19, 2003, the
Ninth Circuit Court of Appeals granted the motion for limited
remand to permit Smith to amend his petition for writ of habeas
corpus.  The Circuit stated its intent to hold in abeyance a
determination of Petitioner's ineffective assistance claims until
these district court proceedings have been concluded.  On July 1,
2003, Petitioner filed an "Amendment to Petition for Writ of

Habeas Corpus."  On July 14, 2003, Petitioner filed a Motion to Stay All Proceedings in federal district court while he exhausted *Apprendi* and *Ring* claims in state court.  On August 14, 2003, this Court denied the Motion to Stay Proceedings because these claims were untimely and futile under state law.

Finally, Respondent filed an Answer to the Amendment to Petition for Writ of Habeas Corpus and a Motion to Dismiss and Motion for Summary Judgment on July 28, 2005.  Smith filed a Cross-Motion for Summary Judgment on January 5, 2006.  Following briefing on all motions, the Court heard oral argument on October 10, 2006.

Factual Background

The August 4, 1982, murders of Harvey Mad Man, Jr., and Thomas Running Rabbit, Jr., took place in the northwest corner of Montana, near East Glacier on U.S. Highway 2.  Smith, who was 25 years old, and two companions, Rodney Munro and Andre Fontaine, had crossed the Canadian border on foot the previous day, with a sawed-off .22 rifle in a backpack and ammunition in Smith's front shirt pocket.  (Exhibit 1 at p.8, Docket #152.)  The three

6

traveling companions used alcohol and drugs over the three-day
period, August 2-4.  *(Ex. 1 at 8.)*   On August 4, Smith and his
two friends played pool in a bar in East Glacier, Montana, with
two cousins, Thomas Running Rabbit, Jr., (age 20), and Harvey Mad
man, Jr., (age 23).  *(Ex. 1 at 8.)*  Later in the day, the cousins
picked up the three men (Smith, Munro, and Fontaine), who were
hitchhiking on U.S. Highway 2.  *(Ex. 1 at 8.)*  Approximately 20
minutes later, the cousins stopped their car so they could
relieve themselves; when they returned to the car, however, they
were met by Smith and a loaded gun.  (Sentencing Hearing
Testimony of Ronald Allen Smith, Ex. 14 at 0725.  Docket #153).
Smith wanted their car for his own use, in order to travel more
quickly than the three men could otherwise travel by hitchhiking.
(Ex. 14 at 0710-0711.)  One of the cousins asked Smith not to
shoot them.  (Ex. 14 at 0685.)  The cousins were marched into the
woods, however, until the group was not visible from the road,
where Smith shot the driver in the back of the head from a
distance of seven or eight feet.  (Ex. 14 at 0685, 0687.)  Both
Rodney Munro and the passenger looked incredulously at Smith
after he killed the driver.  (Ex. 14 at 0709.)  Smith then

reloaded the gun with a bullet from his pocket and shot the other cousin in the back of the head. (Ex. 14 at 0709.) Rodney Munro was incredulous and shocked by what Smith had done. (Ex. 14 at 0690.) Once back in the car, Smith's other traveling companion, Andre Fontaine, was so affected by the shootings that he could not drive the car properly, so Smith took over the driving responsibility. (Ex. 14 at 0691.) After taking license plates off an abandoned car on the roadside, the three men continued on in the victims' car to Portland, Oregon, and then to California, where they robbed a convenience store. (Ex. 14 at 0693.) Eventually, Smith was arrested in Wyoming. (Ex. 14 at 0695.) While jailed in Wyoming, Smith offered money to his cellmates in exchange for their help in moving the bodies of Harvey Mad Man, Jr., and Thomas Running Rabbit, Jr. (Ex. 14 at 0696.) Smith provided his cellmates with a map showing the location of the bodies. (Ex. 14 at 0701.) Smith also wrote a letter to Rod Munro's girlfriend, enlisting her help in obtaining $500 to $1000 to pay for removal of the bodies. (Ex. 14 at 0699.) That letter acknowledges that Smith's sister had already been in communication with Munro's girlfriend about trying to obtain the

money so that Smith could get the bodies moved.  (Ex. 14 at
0699.)  Smith wrote the letter believing that he could keep it
out of the hands of the authorities (but it turned out he did
not).  (Ex. 14 at 0700.)  The victims' remains were discovered 44
days after the murders, and Smith was then charged and returned
to Montana for prosecution.  (Ex. 1 at 0009.)

After a brief escape from the Flathead County, Montana,
jail, Smith plead guilty to all charges on February 24, 1983, at
which time he asked to be sentenced to death.  At his first
sentencing, held on March 21, 1983, Smith again asked to be
sentenced to death, and the court did impose that sentence.

Legal Standard Applicable to § 2254 Habeas Petition

This is a pre-AEDPA case.  *See* Antiterrorism and Effective
Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132, 110
Stat. 1214.  Under the less deferential standard supplied by pre-
AEDPA law, factual findings of the state district court are
entitled to a presumption of correctness unless they lack fair
support in the record.  *See Silva v. Woodford*, 279 F.3d 825, 835
(9th Cir. 2002)(as amended).  Habeas relief should be granted

"only on the ground that [petitioner] is in custody in violation
of the Constitution or laws or treaties of the United States."
28 U.S.C. § 2254(a).  Written determinations on the merits of
factual issues by state courts are presumed to be correct unless
the petitioner establishes:

> (1) that the merits of the factual dispute were not
> resolved in the State court hearing;
> (2) that the factfinding procedure employed by the
> State court was not adequate to afford a full and fair
> hearing;
> (3) that the material facts were not adequately
> developed at the State court hearing;
> (4) that the State court lacked jurisdiction of the
> subject matter or over the person of the applicant in
> the State court proceeding;
> (5) that the applicant was an indigent and the State
> court, in deprivation of his constitutional right,
> failed to appoint counsel to represent him in the State
> court proceeding;
> (6) that the applicant did not receive a full, fair,
> and adequate hearing in the State court proceeding; or
> (7) that the applicant was otherwise denied due process
> of law in the State court proceeding;
> (8) or unless that part of the record of the State
> court proceeding in which the determination of such
> factual issue was made, pertinent to a determination of
> the sufficiency of the evidence to support such factual
> determination, is produced as provided for hereinafter,
> and the Federal court on a consideration of such part o
> the record as a whole concludes that such factual
> determination is not fairly supported by the record....

28 U.S.C. § 2254(d)(1)-(8) (1996).

When a habeas petitioner does not establish, the respondent

10

will not admit, and the federal court does not find, any one or
more of the conditions listed by section 2254(d)(1)-(8), then, as
to any factual dispute, "the burden shall rest upon the applicant
to establish by convincing evidence that the factual
determination by the State court was erroneous."  28 U.S.C.
§ 2254(d).

Habeas relief is warranted if the constitutional error
alleged is found to have "had substantial and injurious effect or
influence in determining the jury's verdict."  *Brecht v.*
*Abrahamson*, 507 U.S. 619, 613, 113 S. Ct. 1710, 123 L.Ed.2d 353
(1993) (internal quotation marks omitted).  If the court finds
itself in "grave doubt" whether the error had a substantial or
injurious effect or influence, then the error is not harmless and
the petitioner must win.  *O'Neal v. McAninch*, 513 U.S. 432, 436,
115 S.Ct. 992, 994 (1995).


Legal Standard Applicable to Motion to Dismiss

Section 2254 requires the exhaustion of state remedies,
meaning that petitioner must have adequately presented his claims
in state court prior to seeking federal habeas relief.  28 U.S.C.

11

§ 2254(b).  Petitioner must "fairly present" his claims to the highest state court.  *Picard v. Connor*, 404 U.S. 270, 275 (1971).  Both the factual basis and the federal constitutional basis must be presented in state court.  *Gray v. Netherland*, 518 U.S. 152, 162-63 (1996).  When a petitioner fails to present his claim in state court, he must demonstrate "cause for the default and actual prejudice as a result of the allegation violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice."  *Vansickel v. White*, 166 F.3d 953, 958 (9th Cir. 1999), *cert. denied*, 528 U.S. 965 (1999).  Failure to show cause and actual prejudice or a fundamental miscarriage of justice will result in a forfeit of the right to present a federal habeas claim.  *See Engle v. Isaac*, 456 U.S. 107, 129 (1982).


Legal Standard Applicable to Motion for Summary Judgment

     A habeas petition may be tested by summary judgment procedures.  *Blackledge v. Allison*, 431 U.S. 63, 97 S.Ct. 1621, 52 L.Ed.2d 136 (1977).  Factual determinations by the trier of fact, and necessary inferences therefrom, are entitled to a

presumption of correctness.  28 U.S.C. § 2254(d) (1996).  When a state appellate court makes findings of fact, those findings are also entitled to the presumption of correctness.  *Sumner v. Mata*, 449 U.S. 539, 101 S.Ct. 764, 66 L.Ed.2d 722 (1981).

Summary judgment may be used to ferret out factually baseless habeas claims.  *Rich v. Calderon*, 187 F.3d 1064, 1067 (9th Cir. 1999).  However, there is no automatic right to discovery, but rather, a petitioner must show good cause for discovery by showing facts that establish a need for further factual development.  *Bracy v. Gramley*, 520 U.S. 899, 117 S.Ct. 1793, 138 L.Ed.2d 97 (1991).  *Rich* explains that "[h]abeas is an important safeguard whose goal is to correct real and obvious wrongs.  It was never meant to be a fishing expedition for habeas petitioners to 'explore their case in search of its existence.'" *Rich v. Calderon*, 187 F.3d at 1067.

On the other hand, an evidentiary hearing is required where the facts underlying a constitutional claim are in dispute and the habeas petitioner did not receive a full and fair hearing in a state court.  *Townsend v. Sain*, 372 U.S. 293, 312 (1963).  The habeas petitioner must demonstrate that (1) the alleged facts, if

13

proved, would entitle him to relief, and (2) an evidentiary hearing is required to establish the truth of his allegations. *Pierce v. Cardwell*, 572 F.2d 1339, 1340-41 (9th Cir. 1979).


Discussion of Petitioner's Claims

Claim 1.  Smith alleges that the judge selection process under Montana law is unconstitutional because it violates his right to due process of law under the Fifth and Fourteenth Amendments of the United States Constitution.  (Petition at 17, ¶ 67.)  In Montana, when a judge is substituted or disqualified for cause, that judge retains the responsibility for calling in subsequent judges to handle the case.  Montana law provides that

> "[t]he first district judge who has been substituted or disqualified for cause shall have the duty of calling in all subsequent district judges."

Mont. Code Ann. § 3-1-804(1)(b).  Smith failed to raise this claim on direct appeal (on any of his three direct appeals).  The procedural default doctrine applies, and therefore Respondent's Motion to Dismiss should be granted as to Claim 1.  Furthermore, Petitioner abandons Claim 1 in response to the Motion to Dismiss.

14

    <u>Claim 2 and Claim 13</u>.  In Claims 2 and 13, Smith alleges
that Judge Larson's consideration of Dr. Stratford's testimony
violates his constitutional rights under the Fifth, Sixth,
Eighth, and Fourteenth Amendments to the United States
Constitution.  In both Claims 2 and 13, Smith also alleges that
consideration of Dr. Stratford's testimony also violates the
mandate of *Smith v. McCormick*, 914 F.2d 1153 (1990).  (Petition
at 18, ¶ 70.)

    Claim 2 is procedurally defaulted as to any violation under
the Eighth Amendment.  As to all other violations alleged, the
Montana Supreme Court's finding that Judge Larson did not
consider or rely upon Dr. Stratford's report in determining
Smith's sentence is entitled to deference because it is fairly
supported by the record.  The Montana Supreme Court found that

> [t]he reference to Dr. Stratford's report in finding
> number 20 can best be described as a historical
> reference.  Dr. Stratford's report is not discussed in
> the court's detailed findings concerning mitigating
> circumstances; only evidence which was admitted at the
> sentencing hearing is there discussed or relied upon.
> Nowhere in the court's findings discussing Smith's
> mental history is Dr. Stratford's opinion discussed or
> relied upon.  Further, nowhere in the court's
> discussion of Smith's ability to appreciate the
> criminality of his conduct is Dr. Stratford's report
> discussed or relied upon.  We hold that the District

15

> Court's finding number 20 is not contrary to the Ninth
> Circuit Court's opinion in *Smith v. McCormick*, and that
> the finding does not establish that the court
> erroneously relied upon Stratford's opinion.

*Smith III*, 931 P.2d at 1282.  The Montana Supreme Court's finding
is clearly supported by the record.  Judge Larson's findings at
paragraph 16 through 24 describe the developments in Smith's case
following his arrest on August 27, 1982, and these paragraphs
merely provide brief descriptions of:

-- Smith's escape from Flathead County jail,

-- the plea negotiations undertaken by defense counsel and
the Flathead County Attorney,

-- the change of plea hearing on February 24, 1983,

-- the sentencing hearing on March 21, 1983, Smith's
motion for and May 2, 1983, hearing on a request for
reconsideration of sentence and request for psychiatric
examination,

-- the granting of the requesting for psychiatric
examination,

-- the appointment of Dr. William Stratford for that
purpose,

-- Dr. Stratford's testimony at a hearing on December 1,

16

1983,

--    Smith's motion for additional psychiatric examination,
      the court's issuance of Findings of Fact and
      Conclusions of Law,

--    the appellate activity (direct, post-conviction, and
      federal habeas),

--    the reversal by a Ninth Circuit panel noting the *Ake v.*
      *Oklahoma* error,

--    the third sentencing hearing,

--    the Montana Supreme Court reversal of that sentence on
      direct appeal,

--    the preparation of a new presentence report for the
      sentencing before Judge Larson.

(Ex. 1 at 0011-0015.)  Obviously, this is a historical recitation
of the procedural background of the case between arrest and final
sentencing.  It is not a section of the Findings of Fact and
Conclusions of Law wherein Judge Larson explains the
underpinnings of his mitigation findings or the ultimate
sentence.  Therefore, the one brief description of Dr.
Stratford's testimony on December 3, 1983, does not support

17

Smith's Claim that Judge Larson considered Dr. Stratford's testimony in determining the sentence or that Judge Larson violated *Smith v. McCormick* by acknowledging the fact of Dr. Stratford's testimony.[1]  This obvious conclusion is further supported by the fact that Judge Larson stated that he would only allow the State to present Dr. Stratford's testimony as rebuttal, and the State chose not to present that testimony.  (Amended Petition ¶ 71(a) at 18.)  Finally, the section of the Findings of Fact and Conclusions of Law wherein Judge Larson did present the rationale for his decision to impose the death penalty and wherein Judge Larson did make findings as to Smith's state of mind at the time of the offense, *see* Ex. 1 at 0033-0034, 0038-0039, 0040-0041, 0044-0046, 0049-0052, makes absolutely no reference to Dr. Stratford's report or testimony.  Judge Larson actually lists the sources upon which he relied in determining Smith's ability to appreciate the criminality of his conduct and

---

[1]  The only sentence describing Dr. Stratford's testimony is this: "At a hearing on December 1, 1983, Dr. Stratford testified that Defendant Smith's consumption of drugs and alcohol would not have substantially impaired his ability to appreciate the criminality of his conduct on August 4, 1982."  This finding of fact is *correct*, of course, because Dr. Stratford *did* so testify.

Smith's state of mind: the testimony of Dr. Anne Evans, Smith's scale 4 of the MMP-II (which shows "poor judgment, unstable, irresponsible, self-centered, immature, anti-social, aggressive, or assaultive"), other psychological tests focusing on cognition, the testimony of Dr. Pittell, and Smith's actions before, during, and after the murders.  This Court's inescapable conclusion is that Judge Larson did not consider or rely upon Dr. Stratford's report or testimony and that Claim 2 is without merit.

In addition, Smith abandons his Eighth Amendment claim under Claims 2 and 13, preferring to argue that his Fifth, Sixth, and Fourteenth Amendment claims are exhausted in state court.

Another facet of Claim 2 is Smith's allegation that Judge Larson improperly considered the prior death sentences imposed by Judges Keedy and Harkin.  Smith alleges that Judge Larson, in the Findings of Fact and Conclusions of Law, Exh. 1, actually notes that prior death sentences were imposed and notes what, if any, errors were found by the appeal of those sentences.  Smith concludes that such acknowledgment evinces a "predilection on the part of the Court [Judge Larson] to 'do it right.'" (Amended Pet. ¶ 71(e) at 19.)  Smith cites nothing in the law and nothing in

19

the record to support his claim.  Judge Larson's only mention of
the prior sentences is contained in the section of his order
describing the prior procedural history of the case.  *See* Ex.
1,¶¶ 16-24, 0011-0015.  Absent some authority for the proposition
that a substitute judge should attempt to remain ignorant of
prior case history, the Court concludes that this argument is not
serious.  Surely it can hardly be argued that Judge Larson would
have been wrong to have an attitude of 'wanting to do it right.'
Generally, the law requires that judges learn from the mistakes
and successes of other judges, and this is the usual consequence
of the bedrock legal principle of *stare decisis*.  This Court is
unpersuaded by Smith's argument that Judge Larson was improperly
influenced by knowing what other judges had done in the case
before he received it, or that Judge Larson was wrong in wanting
not to commit any errors committed by previous judges in the
case.  Smith fails to point to any law or fact that supports this
meritless argument.

Claim 3.  In this Claim, Smith alleges that 16 years on
death row and four sentencings violates his rights under the
Fifth, Sixth, Eighth, and Fourteenth Amendments.  Smith also

20

alleges that Judge Larson was influenced by the death sentences imposed by prior judges in the case.

As to improper influence of prior death sentences, the Montana Supreme Court addressed this argument on direct appeal in *State v. Smith*, 931 P.2d 1272, 1287-88 (1996) ("*Smith III*").  The Montana Supreme Court found that Smith presented "only speculative assertions about the effect of his prior death sentences on the District Court." *Smith III*, 931 P.2d at 1287. The Montana Supreme Court discounted the case law cited by Smith that discusses the effect on a jury when a jury knows that a defendant has a prior death sentence. *See, e.g., Romano v. Oklahoma*, 512 U.S. 1, 114 S.Ct. 2004, 129 L.Ed.2d 1 (1994) (holding no constitutional violation when jury told that defendant has prior death sentence).  A district judge is expected to be able to set aside irrelevant information that should not be considered in determining sentence.  Not having been provided any facts that show that Judge Larson was improperly influenced by prior death sentences, the Montana Supreme Court dismissed this argument.

Similarly, this Court has not been provided any facts that

would tend to suggest that Judge Larson was improperly influenced by the prior imposition of death sentences on Smith.  Smith only contends that his sentencing judge knew what had transpired in his case, prior to his sentencing judge taking over the case, and, in addition, Smith contends that his sentencing judge knew what errors had been committed by the prior sentencing judges.  There is nothing here upon which to base a constitutional violation.  Nothing in the law requires a substitute judge to intentionally shroud himself in ignorance.  But this argument merely repeats the same argument made in Claim 2.

A new argument contained in Claim 3 is that Smith's Fifth, Sixth, Eighth, and Fourteenth Amendment rights have been violated by virtue of the number of years he has spent on death row.  Smith committed the murders in 1982 and was first sentenced to death in 1983.  Thus, twenty-three years have gone by since Smith was first sentenced to death on March 21, 1983.  Smith did present this claim to the Montana Supreme Court, which dismissed the claim and concluded that "Smith has benefitted from the appellate and federal review process of which he has availed himself and which has resulted in the delay and the multiple

sentencing hearings in this case." *Smith III*, 931 P.2d at 1288.
The Montana Supreme Court then held that Smith's constitutional
rights were not violated by the delay.  *Id.*  This is correct
under the current state of the law, *see McKenzie v. Day*, 57 F.3d
1461 (9th Cir. 1995), *adopted en banc*, 57 F.3d 1493, and comports
with logic and good sense.  Smith caused the delay about which he
complains.  While the State of Montana has an interest in swift
punishment, that interest must be balanced by the Court against
Smith's rights to due process and to be free from cruel and
unusual punishment.  Smith has no basis to complain of the delay
he has caused and by which he benefits.  This argument and the
argument that Judge Larson was influenced improperly by the prior
death sentences are both without merit.  The Court notes that in
briefing Smith has abandoned any Fifth Amendment violation as a
basis for Claim 3.  (*See* Pet. Br. at 11 (Docket #168).)

     Claims 4 and 11.  Smith again claims that his Fifth, Sixth,
Eighth, and Fourteenth Amendment rights under the U.S.
Constitution have been violated due to the length of his
incarceration and the repetitive sentencings he has received.

     The Montana Supreme Court has rejected this argument on

direct appeal.  *Smith III*, 931 P.2d at 1288.  Smith raised this claim in his state post-conviction action but dropped the Fifth Amendment Claim.  Ex. 120, ¶ 80.  That post-conviction claim was decided against Smith, who did not appeal it to the Montana Supreme Court.  The Fifth Amendment claim is therefore procedurally defaulted, and Smith abandons this basis for Claim 4.  (*See* Pet. Br. at 11 (Docket #168).)

Claim 4 repeats the same allegations made in Claim 3, and the Court has concluded that they are without merit.  One allegation not yet addressed is Smith's assertion in Claims 4 and 11 that his rights have been violated by being required to undergo four sentencings.  The four sentencings alleged by Smith are actually three sentencings (by Judge Keedy, by Judge Harkin, and by Judge Larson).  Smith counts Judge Keedy for two sentencings, first in a regular sentencing hearing and second in a confirmation of that sentence and denial of motion to reconsider after a hearing on a motion to reconsider, but really there was only one sentencing hearing by Judge Keedy and one sentence, so the total number of sentencings is three.  Smith cites no case law for the proposition that multiple sentencing

24

hearings violate his constitutional rights.  This Court cannot think what argument Smith ought to have made, but did not make, and concludes that the multiple sentencing argument of Claims 4 and 11 is without merit.

In addition, Smith alleges that it was improper for the Montana Supreme Court to reverse his death sentence in 1991 and remand with instructions that a new judge take over the case. Smith apparently thinks that the constitutional violation is self-evident, because he does not explain how this remand order negatively affected him.  (*See* Amend. Pet. ¶ 77(e) at 22.)  This Court, again, cannot perceive what precise constitutional violation Smith is alleging, and without the guidance of case law by which to navigate, the Court is adrift.  Smith's allegation that this remand to a new judge violates Montana law is simply incorrect, as Montana law provides for remands to new judges in unusual circumstances.  *See State v. Mason*, 82 P.3d 903, 910 (Mont. 2003) (*citing Coleman v. Risley*, 663 P.2d 1154, 1161 (Mont. 1983) (holding assignment of new judge on remand is governed by three factors)).  There appears to be no conflict with a Montana statute providing for substitutions by the parties

25

*as of right.*  *See* Mont. Code Ann. § 3-1-804(1)(g).  This Court must conclude that all of Smith's Claim 4 and Claim 11 allegations are without merit.

<u>Claim 5.</u>  Smith alleges that Montana's capital sentencing scheme is unconstitutionally vague and arbitrary and capricious because it fails to establish any standard or burden of proof as to aggravating or mitigating circumstances and the comparative weighing thereof.  Smith further alleges that the appropriate standard or burden of proof should be the 'beyond reasonable doubt' standard.

In Montana, the State must prove each element of the capital offense and the existence of an aggravating circumstance.  *See Smith II*, 863 P.2d at 1011 (*citing Walton v. Arizona*, 497 U.S. 639 (1990) (*overruled on other grounds, Ring v. Arizona*, 536 U.S. 584 (2002)).  A defendant bears the burden of proving any mitigating circumstances.  *Id.*

The State responds to this argument by asserting that Montana's capital sentencing statute is not vague and does narrow the class to which capital punishment is applicable, thereby satisfying the standard set by the U.S. Supreme Court in *Zant v.*

26

*Stephens*, 462 U.S. 862, 878-879, 890 (1983) (noting as to jury sentencing in capital cases that "the Constitution does not require a State to adopt specific standards for instructing the jury in its consideration of aggravating and mitigating circumstances").  The State asserts that Montana's capital sentencing statute also provides for an individualized consideration of a defendant's character, criminal record, and offense, as is required by the U.S. Supreme Court in *Romano v. Oklahoma*, 512 U.S. 1, 10 (1994).

Indeed, the aggravating circumstance in this case rests upon the fact that Smith plead guilty to two aggravated kidnapping charges, and in each case the aggravated kidnapping resulted in the death of the victim.  *See* Mont. Code Ann. § 46-18-303(7) (1995).  A second type of aggravating circumstance exists because the deliberate homicide scheme resulted in the death of more than one person, and by Smith's plea and acknowledgment in state court, Smith does not challenge the existence of this aggravating circumstance.  *See* Mont. Code Ann. § 46-18-303(5) (1995); *see also*, Ex. 1, ¶7(a) at 0019.  There is no question as to the precise nature of these aggravating circumstances nor the fact

27

that they are correctly applied in this case.  Neither is there any reason to believe that these aggravating circumstances are arbitrary and capricious.  Furthermore, Smith presents no persuasive argument that either of these aggravating circumstances does not "reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder."  *Zant v. Stephens*, 462 U.S. 862, 877 (1983).  Furthermore, in this case, the Montana Supreme Court conducted an appellate review of Smith's death penalty under statutory guidelines in order to prevent an arbitrary imposition of the death penalty.  *See* Mont. Code Ann. § 46-18-310(3) (1995).[2]

Finally, the U.S. Supreme Court has not required that the weighing of aggravating and mitigating circumstances meet the 'beyond reasonable doubt' standard, and Smith does not provide any citation to the contrary.  In *Tuilaepa v. Calif.*, 512 U.S. 967 (1994), the Supreme Court ruled that the state need not give

---

[2]  This statute requires a proportional review of any death sentence by the Montana Supreme Court to determine "whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant.  The court shall include in its decision a reference to those similar cases it took into consideration."  Mont. Code Ann. § 46-18-310(3) (1995).

the sentencer specific guidance on how to weigh any of the aggravating factors.  512 U.S. at 978-80.  Instead, the sentencer is to have "unbridled discretion" to determine whether to impose a death penalty.  512 U.S. at 979-80 (quoting *Zant v. Stephens*, 462 U.S. 862, 875 (1983)).  Montana's capital sentencing statutes narrows the class of persons eligible for the death penalty and requires consideration of any and all mitigating evidence, and it therefore comports with federal law.  Therefore, Claim 5 is without merit.

Claim 6.  Smith challenges Judge Larson's findings as to certain mitigating circumstances under Mont. Code Ann. § 46-18-304 (1995).  Judge Larson found one statutory mitigating circumstance and nine non-statutory mitigating circumstances.[3]

---

[3]  The statutory mitigating circumstance was that Smith had no significant history of prior criminal activity.  (*See, e.g.,* Ex. 1, F(1) at 0028:25-0031:3.)  The nine non-statutory mitigating circumstances were (1) Smith's dysfunctional family of origin; (2) Smith's conduct in prison; (3) the life sentence given to accomplice Rodney Munro; (4) the time spent by Smith on death row while this case has been pending; (5) Smith's expressions of remorse and acceptance of responsibility; (6) Smith's mental or emotional disturbance at the time of the offense (albeit not extreme); (7) Smith's long history of drug and alcohol abuse with no treatment; (8) the initial offer of a plea agreement for sentence other than death; and (9) Smith's minimal impairment in his capacity to appreciate the criminality

Specifically, Smith asserts that sufficient evidence existed such that Judge Larson ought to have found that the offense was "committed while under the influence of extreme mental or emotional disturbance,", and that he had a severe, not "a minimal ability to appreciate the criminality of his conduct and conform his conduct to the requirements of law."  (Amend. Pet. ¶ 82(c)-(d) at 25.)  Smith asserts that Judge Larson ignored the unrebutted testimony of Smith's experts when he made findings on these points, and Smith speculates that Judge Larson surreptitiously relied upon Dr. Stratford's report in making these findings.  Finally, Smith asserts that during the sentencing proceedings Judge Larson should have considered his proportionality evidence that other individuals had committed deliberate homicides but the State had not asked for the death penalty in those particular cases.

The State points out that Smith's evidence of mitigating circumstances was weak and that Judge Larson was entitled to find that Smith did not commit the offense while under the influence of extreme mental or emotional disturbance or that Smith did not

---

of his conduct).  (*See, e.g.,* Ex. 1, F(8) at 0035:26-0041:8.)

act under extreme duress.  The State notes that even Smith's own expert, Dr. Anne Evans, testified that Smith's actions arose out of anger at authority figures, an anger that he probably still possessed at the time of the sentencing hearing.  In other words, although Smith's actions did arise, in an abstract sense, from the influence of an emotional disturbance due to Smith's anger toward his father, that emotional state had existed for many years prior to the offense and possibly continued through the time of sentencing.

In support of this mitigating circumstance, Smith testified at his sentencing hearing that in June, 1981, *thirteen months* prior to his offense (Ex. 14 at 0649:25-0652:1), Smith's father had reacted with irritation when Smith introduced a newly-discovered five-year-old daughter to his father, and it was this rejection that resulted in the emotional disturbance directly resulting in the offense.  This is one explanation for the offense.  Judge Larson considered it carefully.

One can imagine that from Judge Larson's perspective, such an explanation was so broad and encompassing that by explaining so much, it explained nothing about this particular offense,

except to say that Smith killed two young men whilst he
experienced a general and possibly life-long feeling of anger
toward authority (which authority presumably represents, at least
in part, the societal prohibition against killing other persons).
Noting that two of Smith's experts testified that Smith had long-
standing feelings of anger (Ex. 1 at 0031:20-26), Judge Larson
found that "all the evidence did not support the theory that
Defendant Smith was under extreme emotional or mental disturbance
at the time of this offense." (Ex. 1 at 0031:19-20.)  Judge
Larson found that Smith's actions betrayed a "premeditated
deliberateness" not consistent with the explanation of emotional
distress. (Ex. 1 at 0032.)  Judge Larson found that the victims
had extended a helping hand to Smith (by picking up the
hitchhikers) and had done nothing to incite Smith to anger. (Ex.
1 at 0031:1-3, 0038:23-0039:4, 0053:12-14.)  Judge Larson
concluded that Smith had not proved the existence of this
mitigating circumstance by a preponderance of the evidence. (Ex.
1 at 0032:1-2.)

        Similarly, Judge Larson found that Smith's mitigating
evidence of his lack of ability to appreciate the criminality of

the offense and conform his conduct to the law was weak.  Smith
presented evidence that he had used drugs and alcohol in the days
preceding the offense and that his cognitive functioning was
somewhat reduced around the time of the offense.  Judge Larson
found that this evidence was contradicted by the facts of the
offense that showed Smith's actions were careful and calculated:
Smith wanted to obtain a vehicle, he killed the driver and
passenger in a remote location, he took control of the vehicle
and the weapon following the homicides, he showed his leadership
in a subsequent armed robbery in California, he attempted to hire
inmates in Wyoming to move the bodies in Montana, he attempted to
escape from the Flathead County jail after being arrested for the
homicides, and at the time of sentencing he could remember and
describe the offense and the location of the offense.  (Ex. 1 at
0033:16-0034:7.)  Judge Larson also relied on Smith's MMPI-II
test results, which showed "someone with poor judgment, unstable,
irresponsible, self-centered, immature, anti-social, [with]
aggressive or assaultive features" (Ex. 1 at 0034:15-20) as
providing a better explanation for Smith's offense conduct than
his having a basic lack of appreciation for the criminal nature

of his conduct.  Judge Larson then found the nonexistence of this
mitigating circumstance, concluding that Smith did have the
"ability to appreciate the criminality of his conduct and/or to
conform his conduct to the requirements of the law."  (Ex. 1 at
0034:5-7.)  The evidence supports Judge Larson's finding of the
nonexistence of this mitigating circumstance.  Smith's
speculation that Judge Larson secretly relied upon
Dr. Stratford's report to make this finding is unjustified and
ignores the greater weight of the evidence supporting the
finding.

As to Judge Larson's decision not to entertain allegedly
mitigating evidence of other homicide cases wherein the State of
Montana declined to seek the death penalty, this decision appears
to be correct.  The Montana Supreme Court conducted a
proportionality review during the appellate process pursuant to
*Gregg v. Georgia*, 428 U.S. 153 (1976).  In the sentencing
context, evidence of the State's prosecution of other homicide
cases did not pertain to Smith and was not mitigating evidence as
to Smith's character or offense.  While it is true that a
sentencing court must not exclude relevant mitigating evidence

34

from consideration, *Eddings v. Oklahoma*, 455 U.S. 104, 113
(1982), it does not follow that any evidence offered by a
defendant is necessarily relevant mitigating evidence.  The
district court correctly decided that proportionality evidence,
*i.e.,* comparisons to other homicide cases in the state on a case
by case basis, was not appropriately entertained at the
sentencing hearing but should be considered on appellate review.
Especially given that the Constitution does not require any
proportionality review, *Pulley v. Harris*, 465 U.S. 37 (1984),
Smith fails to raise a federal constitutional violation with this
aspect of Claim 6.

Claim 6 is without merit.

Claim 7.  Smith claims that Judge Larson failed to consider
the totality of the eleven mitigating circumstances that he
presented in opposition to imposition of the death penalty.
However, Judge Larson found ten mitigating circumstances, and he
considered each one individually and "in conjunction with all
other factors, character or personality traits of Defendant Smith
which exist in mitigation...."  (*See* Ex. 1 at 0069:17-18.)  The
phrase 'in conjunction with all other factors . . . in

35

mitigation' appears in connection with every mitigation finding

made by Judge Larson.   Thus, Judge Larson states that he

considered all the mitigation factors as a totality.   Smith

provides no evidence otherwise.   Therefore, this Court finds that

Judge Larson did consider all of the mitigating factors both

individually and as a totality.   There is simply no support in

the record for Smith's allegations in Claim 7.   Judge Larson's

mitigation findings are presumptively correct, and Smith has

failed to submit clear and convincing evidence to overcome the

presumption.   Claim 7 is without merit.

    Claim 8.   Smith claims that "[t]he sentence of death was

imposed by the court under the influence of passion, prejudice

and other arbitrary factors in violation of the Fifth, Sixth,

Eighth and Fourteenth Amendments of the United States

Constitution."   (Amend. Petition ¶ 87 at 27.)   In support of

Claim 8, Smith submits a "Daily Interlake" newspaper article

showing that Judge Larson conversed with a journalist prior to

sentencing regarding attorney fees in the case.   The article

states that

            Larson said he did not set down detailed guidelines for
            expenses.  "That's not usually done.  This is a death

penalty case, and expenses run high," he said.

Larson said he is "sensitive to the rights of the
defense team to meet with and have witnesses testify.
Early on, I limited the travel of their expert
witnesses because of their per hour costs.  Instead the
defense attorneys, who are getting much less an hour,
do the traveling."

     ***

Right before and after the sentencing hearing, Larson
said, "It seemed more important for my focus to be on
the merits of the case, rather than divert attention
and scrutinize each expense voucher so closely.  I'll
tighten down again now as we step back from the
sentencing."

He noted that incidental expenses are not unusual.

"Also," said Larson, "I try to take into account some
of the different standards and expectations of defense
witnesses from other areas.  I've tried to be flexible
and understanding without letting things get out of
hand.

"In fact, I recently refused reimbursement to Vernay
for his telephone calls with you," he told the Inter
Lake's reporter.

     ***

Under a new state program, the county will be
reimbursed for many of the Smith case costs.

"That will spread out the high price of such a death-
penalty case, so Flathead County taxpayers aren't
footing the entire bill," Larson said.

(Amend. Petition, Ex. I, at 11-12.)  Smith's counsel do not

provide the date of this newspaper article, but it appears to

have been published after the sentencing hearing ("Right before

and after the sentencing hearing, Larson said, "It seemed more

important for my focus to be on the merits of the case, rather

than divert attention and scrutinize each expense voucher so closely.  I'll tighten down again now as we step back from the sentencing.").  Any confusion created earlier in the article by the statement that "[Judge Larson] is expected to sentence Smith within a couple of months" probably relates to the fact that Judge Larson did not issue his written "Findings of Fact, Conclusions of Law, Order and Judgment" until four months after the sentencing hearing.

However, the Montana Supreme Court reviewed the newspaper articles offered by Smith, including this one, and determined that nothing in the newspaper articles indicated any influence on the district court in sentencing Smith.  *See Smith III*, 931 P.2d at 1286-87.  The Montana Supreme Court noted that Judge Larson was quoted in the one article discussing the high cost of the case, and that Judge Larson acknowledged that costs run high in death penalty cases.  The Montana Court found that these articles were not appropriate or relevant for consideration on appellate review.

This Court finds that Judge Larson's comments in the "Daily Interlake" article (Amend. Petition, Ex. I, at 10-11) do not

38

indicate any passion, prejudice, or other arbitrary factor influencing the sentencing decision in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution.  The Montana Supreme Court found that Judge Larson's comments revealed a balanced and impartial demeanor, and this Court also so finds.  Contrary to Smith's allegations of wrongdoing, Judge Larson's comments do not violate the ABA Model Code of Judicial Conduct, Canon 3B(9) (allowing judges to make public statements regarding the procedures of the court for public information), because these comments pertain to procedural matters and do not touch on the merits of the case.  A district court's administration of defense counsel's attorney fee vouchers and costs is a matter of court procedure and is a matter about which the public may reasonably request information.

In support of Claim 8, Smith's counsel cite the *Microsoft* case, wherein the district judge gave comments to the media regarding his "opinions about the credibility of witnesses, the validity of legal theories, the culpability of the defendant, the choice of remedy, and so forth [which] all dealt with the merits of the action." *United States v. Microsoft*, 253 F.3d 34, 112

39

(D.C. Cir. 2001).  Judge Larson's comments do not fall into this category and were not improper.  Aside from Judge Larson's quotes in this newspaper article, Smith presents no evidence that requires further inquiry or consideration.  There is simply no evidence that Judge Larson was influenced by passion, prejudice, or other arbitrary factors in arriving at the sentence in this case.

Smith's assertion that he is entitled to discovery and evidentiary hearing on this point would result in nothing more than a fishing expedition, to which Smith is not entitled.  Judge Larson's findings of fact are reasonable and thoroughly supported by the record.  There is no justification for Smith's speculation that media coverage influenced Judge Larson's decision when the support in the record is so obvious.  Claim 8 is without merit.

Claim 9 and 10.  Smith abandons these claims and consents to entry of judgment on these claims in favor of Respondent.

Claim 11.  Claim 11 is addressed above at Claim 4.

Claim 12.  Smith alleges vindictive prosecution by the State of Montana in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments of the United States Constitution.

40

Although Smith has procedurally defaulted on the Fifth, Sixth, and Fourteenth Amendment claims, the Eighth Amendment claim has been exhausted, as it was denied by the Montana Supreme Court. *See Smith III*, 931 P.2d at 1276.

Smith acknowledges that in February 1983 he was offered a plea agreement calling for a term of 110 years imprisonment. Smith rejected the plea agreement.  Instead, Smith filed notice that he intended to plead guilty to all counts and to seek the death penalty.  Therefore, although a plea agreement was offered, it was rejected.  Smith now claims that the fact that the prosecutor recommended the death penalty at the time of sentencing is indicative of vindictive prosecution.  Smith asserts that by recommending the death penalty, the prosecutor retaliated against him for the exercise of his free speech rights.

This is rather a murky claim.  Apparently the free speech right in question is Smith's right to make a public statement that he was rejecting the plea agreement in order to "proceed to trial and spend the county's money."  (Amend. Pet. ¶ 100(b) at 32.)  Smith changed his mind and did plead guilty to all charges

41

without the benefit of a plea agreement.  However, having changed his mind about wanting to receive the death penalty after pleading guilty, Smith is now claiming that because he exercised his right to reject the plea agreement, the state prosecutor retaliated against him by recommending the death penalty.

The Montana Supreme Court reasoned that the State was entitled to recommend the more severe penalty after Smith rejected the plea agreement.  *See Smith III*, 931 P.2d at 1276. The Montana Supreme Court cites *Bordenkircher v. Hayes*, 434 U.S. 357 (1978), wherein the United States Supreme Court held that due process is not violated when during plea negotiations a prosecutor threatens to charge a defendant with a more serious charge if the defendant will not enter into a plea agreement on a lesser charge, and then the prosecutor follows through on the threat.  Here, due process is not violated when Smith did not enter into a plea agreement and therefore had no reasonable expectation of the proposed recommendation offered therein. Smith was merely sentenced on the original charges and no new charges were brought in retaliation.

In addition, the prosecutor testified that after Smith

42

rejected the plea agreement, the prosecutor learned of additional facts about the offense that led him to believe that a recommendation of the death penalty was appropriate. (Ex. 8 at 00368.) Smith fails to persuade this Court that a presumption of vindictiveness is justified or that there is any evidence supporting actual vindictiveness.

Claim 13. Claim 13 is addressed above at Claim 2.

Claim 14. Smith claims that Judge Larson went outside the record and relied upon Dr. Stratford's report in the face of unrebutted expert testimony that Smith's consumption of drugs and alcohol on the day of the offense substantially impaired his ability to appreciate the criminality of his conduct and to conform his conduct to the requirements of the law.

As this Court has previously found, there is absolutely no evidence that Judge Larson went outside the record and relied upon the report or testimony of Dr. Stratford. To the contrary, Judge Larson conscientiously states the precise bases for his findings, and nowhere does he list any reliance on Dr. Stratford's report.

Judge Larson carefully considered the testimony presented by

Smith's experts on the question of Smith's use of drugs and

alcohol.  Judge Larson found that

> While Defendant Smith had a long history of drug and
> alcohol use dating back to his pre-teen years and
> Defendant Smith had in fact taken or used drugs and
> alcohol in the days preceding the criminal activities
> at issue here, his actions were careful and calculated
> to obtain a vehicle, kill and hide the bodies of the
> victims in a remote location, and use that vehicle
> later in the commission of other crimes.  Defendant
> Smith's actions in shooting the victims some distance
> from the road where they could not be found, his
> control of the weapon and the vehicle following the
> homicides and his leadership in later criminal
> activity, including the armed robbery in California
> with the same weapon as well as the attempt to hide the
> bodies after being arrested in Wyoming by contact his
> sister and offering money to other inmates, his ability
> to remember, describe and map the location of the
> offenses and finally his actions in attempting to
> escape from the Flathead County jail, all indicate his
> ability to appreciate the criminality of his conduct
> and/or to conform his conduct to the requirements of
> the law.

Ex. 1, 4(a) at 0033-34; *see also Williams v. Woodford*, 384 F.3d

567, 624 (9th Cir. 2004) (reasoning that there is little basis

for believing that drugs materially affected the defendant's

behavior at the time of the crimes when the facts of the crimes

reflect deliberate and methodical action).

Judge Larson did consider the testimony of Dr. Anne Evans

but found that her testimony was contradicted by the facts of

44

this case (Ex. 1, 4(b) at 0034:8-12), and that her own
conclusions about alcohol and drug homicides in general were not
applicable to the facts of this case (Ex. 1, 4(b) at 0034:12-15).
Also, Judge Larson relied more strongly on Dr. Evans' testimony
regarding Smith's very high psychopathic deviancy test score,
stating that this test score explained more about Smith's mental
state than Smith's use of alcohol and drugs.  (Ex. 1, 4(b) at
0034:15-20.)

Noting that Smith had never received drug or alcohol
treatment, Judge Larson also considered the testimony of Smith's
other expert, Dr. Pittell:

> It is speculative to say that drug and alcohol
> treatment would have caused Defendant Smith to end his
> drug and alcohol abuse and change his adult life.
> Dr. Pittell testified that he could only say guardedly
> that it might have made a difference.  (T. at 490).

(Ex. 1, 4(g), at 0051.)

Judge Larson supported his finding that Dr. Evans' testimony
carried minimal weight in light of the facts of the case, the
test score, and the internal inconsistency within Dr. Evans'
testimony.  (Ex. 1, 4(b) at 0045.)  Judge Larson supported his
finding that Smith's alcohol and drug use was a mitigating

45

circumstance but was not sufficient (alone or in conjunction with all other mitigating circumstances) to call for leniency.  (Ex 1, 8(g) at 0051.)  These findings (and the finding of the Montana Supreme Court that Judge Larson's reference to Dr. Stratford's report and testimony is only historical recitation) are all entitled to the presumption of correctness because they are fairly supported by the record, and because Smith has failed to produce evidence to overcome the presumption.

Claim 15.  Smith claims that his privilege against self-incrimination and his right to counsel were violated under the Fifth and Fourteenth Amendments of the United States Constitution when Judge Larson relied on Dr. Stratford's report to find against him on two allegedly mitigating circumstances.  Judge Larson found that Smith did have the ability to appreciate the criminality of his conduct and conform his conduct to the requirements of the law *(see, e.g.,* Ex. 1 at 0033:10-0034:25), and that Smith was not acting under extreme mental or emotional distress (*see e.g.,* Ex. 1 at 0031:4-0032:14).  Nowhere in Judge Larson's findings is Dr. Stratford's name mentioned, nor Dr. Stratford's report, nor Dr. Stratford's findings.  The Montana

46

Supreme Court has so found.  *See Smith III*, 931 P.2d at 1282.
This Court has so found.  The presumption of correct attaches and
is not overcome by Smith.  Claim 15 is without merit.

Claim 16.  Smith claims that Montana's statutory sentencing
scheme, in which a judge rather than a jury considers and imposes
sentence in a death penalty case, violates his Fifth, Sixth, and
Fourteenth Amendment rights under the United States Constitution
and *Apprendi v. New Jersey*, 530 U.S. 466 (2000).

This claim is without merit for two reasons, one substantive
and one procedural.  First, Smith waived his right to a jury's
verdict when he pleaded guilty to double homicide and aggravated
kidnapping.  In *Apprendi*, the Supreme Court held that any fact
resulting in a sentence greater than that authorized by Charles
C. Apprendi, Jr.'s plea of guilty had to be admitted by Apprendi
or proved to a jury beyond a reasonable doubt.  *Apprendi*, 530
U.S. at 490.  In this case, a capital sentence was authorized by
Smith's guilty plea to a deliberate homicide, Mont. Code Ann. §
45-5-102(2) (1994), to a double homicide, Mont. Code Ann. § 46-
18-303(5) (1995), and to the aggravated kidnapping resulting in
death of the victim, Mont. Code Ann. § 46-18-303(7) (1995).  Any

47

right to a jury was waived by him.  Thus, the holding of *Apprendi*
is not applicable to Smith's case.

Second, even were *Apprendi*'s holding applicable here, Smith
could not avail himself of it because it is not retroactive to
sentences finalized on direct appeal prior to the issuance of
*Apprendi* in 2000.  *United States v. Sanchez-Cervantes*, 282 F.3d
664, 667 (9th Cir. 2002).  Even though the United States Supreme
Court has held in *Ring v. Arizona*, 536 U.S. 584, that a
sentencing judge alone may not find the aggravating factor
necessary to authorize the death penalty, the holding of *Ring* is
also not retroactive to cases that were finalized on direct
review before *Ring* was decided.  *Schriro v. Summerlin*, 542 U.S.
348, 358 (2004).  This case was finalized on direct appeal on
November 10, 1997, when the United States Supreme Court denied
Smith's petition for certiorari.  In any event, Smith's guilty
pleas to the double homicide and aggravated kidnappings
authorized the death penalty in this case.

Claim 16 is without merit.

Accordingly,

IT IS HEREBY ORDERED that Respondent's Motion to Dismiss and

48

Motion for Summary Judgment (Docket #161) are GRANTED,

Petitioner's Motion for Summary Judgment (Docket #168) is DENIED,

and Petitioner's Amended Petition for Writ of Habeas Corpus

(Docket #143) is DISMISSED.  The stay of execution entered by the

Ninth Circuit panel on May 28, 1997, *see* Docket #127, remains in

full force and effect, pending further order of the United States

Court of Appeals of the Ninth Circuit.

IT IS FURTHER ORDERED that the Clerk of Court forward a copy

of this Order to Ed Smith, Clerk of the Montana Supreme Court,

Rm. 323, Justice Bldg., 215 N. Sanders, P.O. Box 203003, Helena,

MT 59620-3003.

The Clerk is directed forthwith to notify counsel of entry

of this order.

Done and dated this 20th day of March, 2007.

CHARLES C. LOVELL

SENIOR UNITED STATES DISTRICT JUDGE

49