**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| RONALD A. SMITH,<br>*Plaintiff-Appellant,*<br><br>v.<br><br>MICHAEL MAHONEY, Montana State Prison,<br>*Respondent-Appellee.* | No. 94-99003<br>D.C. No.<br>CV-86-198-M-CCL<br><br>ORDER AND<br>AMENDED<br>OPINION |

Appeal from the United States District Court
for the District of Montana
Charles C. Lovell, District Judge, Presiding

Argued April 6, 2009
Submitted March 5, 2010
Seattle, Washington

Filed March 5, 2010
Amended July 13, 2010

Before: Betty B. Fletcher, Sidney R. Thomas and
M. Margaret McKeown, Circuit Judges.

Opinion by Judge Thomas;
Dissent by Judge B. Fletcher

9939

SMITH V. MAHONEY

---

## COUNSEL

Cliff Gardner and Lazuli Whitt, Oakland, California, for the petitioner-appellant.

Mike McGrath, Montana Attorney General, and C. Mark Fowler, Assistant Attorney General, Helena, Montana, for the respondent-appellee.

---

## ORDER

The opinion filed on March 5, 2010 is hereby amended as follows. The second and third full sentences of the second full paragraph, beginning on line 23 and continuing to line 28, in the middle of Slip Op. page 3473 are deleted.

No further petitions for panel rehearing or rehearing en banc will be entertained.

## OPINION

THOMAS, Circuit Judge:

Ronald Smith murdered two men, pled guilty to the crimes, requested capital punishment, and was sentenced to death. Shortly thereafter, Smith changed his mind and requested resentencing. He was resentenced to death in 1984. Since then, Smith has challenged his death sentences in various fora, including this Court, and has been resentenced two more times, once in 1992 and again in 1995. Smith now appeals two decisions. He appeals the district court's 1994 denial of his original ineffective assistance of counsel claim, challenging his counsel's performance during the 1983 death sentencing. He also appeals the district court's 2007 denial of his challenges to the 1995 death sentence. He makes three claims: that the district court failed to consider mitigating evidence; that the district judge was biased against him; and that his continued incarceration violates the Eighth Amendment.

We affirm both the district court's 1994 decision denying Smith's ineffective assistance of counsel claim and its 2007 decision denying Smith's challenges to the 1995 death sentence.

I

A

Ronald Smith was born in Canada in 1957. In August of 1982, Smith and two friends—Rodney Munro and Andre Fontaine—left Canada for Mexico. Smith left Canada because he was "messed up emotionally," in part because of his father's rejection of Smith's daughter, and "had to get away from the environment that [he] was in in order to get calmed down." During this period, Smith, Munro, and Fontaine used drugs heavily, taking between thirty to forty hits of LSD daily.

After crossing the border into Montana, Smith, Munro, and Fontaine patronized a bar on the southeast end of East Glacier. At the bar, they met two Native American men, Thomas Running Rabbit, Jr. and Harvey Mad Man, Jr. The five men drank beers and played pool together. Smith consumed between twelve and eighteen beers that day.

After about an hour, Smith, Munro, and Fontaine took off and began hitchhiking southwest. Fontaine told Smith about his idea to steal a car for themselves even if they had to kill someone to get it. Smith agreed. Soon after, Smith, Munro, and Fontaine were picked up by Running Rabbit and Mad Man.

After about twenty minutes of driving, Running Rabbit and Mad Man left their car to urinate. While Running Rabbit and Mad Man were out of the car, Smith told Munro that they were going to kill Running Rabbit and Mad Man and steal their car. When Running Rabbit and Mad Man returned, Smith put his sawed-off rifle to the back of one of their heads and told them to get back out of the car. Smith and Munro walked Running Rabbit and Mad Man into the woods. After about fifty to seventy-five feet, Smith shot Mad Man. He turned to Munro, reloaded his rifle, and shot Running Rabbit.[1]

The three men stole the car and took off. Fontaine drove at first but he was too affected to drive properly, Smith assumed the responsibility for driving. They drove to California, where Munro and Fontaine were arrested for armed robbery. Smith was arrested in Wyoming.

---

[1]Smith's and Munro's versions differ. Smith testified that he threatened Munro with death if Munro did not kill Running Rabbit, at which point Smith claimed that Munro stabbed Running Rabbit. Munro testified that he chose to stab Running Rabbit without being threatened by Smith.

## B

After Smith's arrest, the County Attorney in Montana offered Smith a plea bargain. In exchange for Smith's cooperation, the County would not seek the death penalty and instead recommend that the court impose two 110 year sentences. Montana law applicable at the time would have made Smith eligible for release after seventeen and a half years.

Smith rejected the bargain. At his arraignment, Smith pled guilty and testified fully to the facts of the crimes. He requested the death penalty. The court, Smith's attorney, and the County Attorney all asked Smith if he understood what he was doing, if he wished to be examined by a psychiatrist, and if he was sure of his decision. Smith answered clearly and directly that he understood his request, that he did not need a psychiatrist, and that he was sure of his decision.

Smith explained his reasons for seeking death. He testified that he considered himself to be a violent person; that he was uninterested in rehabilitation; that he felt no remorse; and that part of the reason he killed the two men was that he had always had "kind of a morbid fascination to find out what it would be like to kill somebody." He testified that he was "extremely satisfied" with the representation provided by his attorney. The transcripts suggest that Smith remained affectless during his remarkably lucid and direct testimony.

Judge Michael Keedy sentenced Smith to death,[2] emphasizing that Smith's request for death was "nothing more than a curious element in this case" and that it did not effect his decision.

---

[2]At the time of sentencing, Montana law provided for judge sentencing in capital cases. Mont. Code Ann. § 46-18-301 (1983). The United States Supreme Court held that judge sentencing in capital cases violated the Sixth Amendment. *Ring v. Arizona*, 536 U.S. 584, 609 (2002). However, the Court later held that the rule announced in *Ring* did not apply retroactively. *Schriro v. Summerlin*, 542 U.S. 348, 358 (2004).

Soon after the 1983 death sentence, Smith changed his mind and asked the court to reconsider the sentence. He conceded that his previous testimony had been exaggerated to increase the chances that he would receive the death penalty. Smith requested that he be examined by a qualified psychiatrist to determine whether he suffered from a mental disease or defect or whether he suffered from a diminished capacity on the day of the murders due to drugs or mental illness, either of which might qualify as mitigating evidence.

The Montana district court granted the motion and ordered that Smith be evaluated by Dr. Stratford, a forensic psychiatrist, who was to testify at a resentencing hearing. At the hearing, Dr. Stratford testified that "he found no evidence that the use of drugs or alcohol affected the defendant's capacity to appreciate the criminality of his conduct, conform his conduct to the requirements of law, or form a criminal intent." *State v. Smith*, 705 P.2d 1087, 1090 (Mont. 1985). Rodney Munro also testified. He stated that "at the time of the crime, [he] was experiencing confusion, flashes of light and hallucinations, having ingested approximately the same amount of drugs and alcohol as the defendant." *Id.* Smith moved for an additional psychiatric evaluation, but the court denied the request. *Id.* at 1090-91.

Smith testified at the resentencing hearing. He stated that he had originally asked for death because he had been deeply depressed, partially because "he had been placed in solitary confinement without fresh air, sunlight, or exercise." *Smith v. McCormick*, 914 F.2d 1153, 1156 (9th Cir. 1990). Having been transferred to a different prison arrangement, "he was more optimistic about surviving in prison." *Id.* Also, family members visited Smith and urged him to live. *Id.* Because at the original sentencing hearing he was angling for the death penalty, he had "purposefully omitted reference to any mitigating factors." *Id.*

In February 1984, the court affirmed its death sentence. The court found that "Defendant['s] voluntar[y] and unhesi-

tating[ ] ingest[ion of] substantial quantities of alcohol on the day these crimes were committed, and numerous tablets or 'hits' of LSD in the days prior thereto, does not relieve him of responsibility for his actions." Smith's "choice to execute [Mad Man and Running Rabbit] was conscious, calculated, and deliberate." The Montana Supreme Court affirmed the judgment. *State v. Smith*, 705 P.2d 1087 (Mont. 1985), *cert. denied* 474 U.S. 1073 (1986).

In 1986, Smith filed a federal petition for writ of habeas corpus. The federal district court denied relief on summary judgment. *Smith*, 914 F.2d at 1156. Smith appealed. A panel of this Circuit reversed and remanded the case to the district court with instructions to (1) conduct an evidentiary hearing on Smith's ineffective assistance of counsel claim, and (2) remand to the state court to resentence Smith with the benefit of a competent psychiatrist and a consideration of the mitigating factors that Smith presented. *Id.* at 1170. As a result of the panel decision, the case was bifurcated into state (resentencing) and federal (ineffective assistance of counsel) proceedings.

1

In the state proceedings, the Montana district court resentenced Smith to death, now for a third time. The Montana Supreme Court vacated the death sentence and remanded for resentencing by a different judge. *State v. Smith*, 863 P.2d 1000, 1017 (Mont. 1993). Montana District Judge John W. Larson assumed the case. Judge Larson held hearings and took testimony from Smith; Smith's daughter; Smith's sister; Andre Fontaine; Rod Munro; Shawn Tontrel, a psychiatric social worker; Dr. Evans, a psychologist; Dr. Pittel, a chemical dependency expert; John Salmonson, Smith's prison teacher; and Richard Wood, a corrections specialist.

At the hearings, Smith testified about his family, his troubled childhood, his tumultuous relationship with his father,

his use of alcohol and drugs beginning at the age of eleven, his criminal history, the discovery of his daughter and his father's rejection of his daughter, and his close relationships with his sister and daughter. Tontrel testified about Smith's childhood, the "very, very severe[ ]" physical abuse Smith suffered at the hands of his parents, the physical abuse his mother suffered at the hands of his father, and the genuine remorse that Smith felt for his crimes. Dr. Evans testified about the extensive psychological tests she conducted on Smith. She testified that at the time of the murders, Smith "was suffering from or under the influence of extreme emotional disturbance." She concluded by stating: "I've never seen a case that I have worked on in 15 years in a capital case of anyone making this much . . . impressive change in real, significant . . . rehabilitation." Dr. Pittel testified about the effects of the drugs Smith was using prior to the murders. John Salmonson, Smith's teacher in prison, testified about Smith's efforts to educate himself in prison. Salmonson stated that Smith's work was "very good" and that he was taking college-level courses, having worked for and received a high school equivalency degree.

In a lengthy and thorough opinion, Judge Larson sentenced Smith to death. The Montana Supreme Court affirmed. *State v. Smith*, 931 P.2d 1272 (Mont. 1996).

In 2007, the federal district court considered Smith's habeas petition, amended to include claims arising from Judge Larsons's resentencing. The district court granted summary judgment for Montana on all claims. *Smith v. Mahoney*, No. 86-198, 2007 U.S. Dist. LEXIS 23772 (D. Mont. Mar. 20, 2007). Smith now appeals that decision. In particular, he appeals his mitigating evidence claim, his judge bias claim, and his Eighth Amendment claim.

2

In 1992, in separate proceedings, the federal district court held an evidentiary hearing on Smith's ineffective assistance

of counsel claim. At the hearing, the court heard testimony from Smith's trial-level defense attorney about his experience with death penalty cases, the time he spent researching and investigating Smith's case, potential defenses, and his reasons for not initially requesting a psychiatric evaluation.

The district court denied Smith's ineffective assistance of counsel claims, finding that nothing that Smith's lawyer failed to do—e.g., order a psychiatric examination, thoroughly investigate the alleged crime, etc.—constituted representation that fell below an objective standard of reasonableness or prejudiced Smith. In particular, the court found that there was not a reasonable probability that, but for defense attorney's errors, Smith would have pleaded not guilty and insisted on going to trial.

The district court issued a Certificate of Probable Cause and Smith appealed the decision. We have jurisdiction to review these claims under 28 U.S.C. § 2253. We first consider Smith's ineffective assistance of counsel claim and then proceed to his challenges to the 1995 death sentence.

## II

Smith argues that his original defense lawyer provided ineffective assistance of counsel because he failed to properly investigate possible defenses to the death sentence and failed to present those possible defenses to Smith.[3] We agree that

---

[3]As a preliminary matter, Montana argues that Smith has not exhausted his ineffective assistance claim. However, Smith raised the failure to investigate and advise claims in his petition for collateral relief to the Montana Supreme Court in 1986. In that petition, Smith contended that his defense lawyer "failed to investigate and/or present available evidence in mitigation at the first sentencing hearing," that his lawyer "failed to advise Petitioner that the facts as testified to by him did not establish necessary proof of the crime with which he was charged," and that his lawyer "failed to have Petitioner examined by a competent psychiatric expert to determine his capacity to understand and enter into his guilty plea." Those three

Smith's lawyer's performance fell below an objective standard of reasonabless. However, because Smith suffered no prejudice from his lawyer's performance, his ineffective assistance claim fails.

The parties agree that this claim is not subject to the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214. Therefore "we do not review the state court's legal conclusions to determine whether they are objectively unreasonable; rather, we simply resolve the legal issue on the merits, under the ordinary rules." *Duncan v. Ornoski*, 528 F.3d 1222, 1233 (9th Cir. 2008) (internal quotation marks omitted). Ineffective assistance of counsel claims are mixed questions of law and fact and we review them de novo. *Summerlin v. Schriro*, 427 F.3d 623, 628 (9th Cir. 2005) (en banc). We review the district court's findings of fact for clear error. *Id.*

To prevail on his ineffective assistance claim, Smith must show that: (1) his trial counsel's performance "fell below an objective standard of reasonableness"; and (2) "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *See Strickland v. Washington*, 466 U.S. 668, 688, 694 (1984). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

In the context of a plea, a petitioner satisfies the prejudice prong of the *Strickland* test where "there is a reasonable probability that, but for counsel's errors, he would not have

---

claims, taken together, satisfy exhaustion. *See also Smith*, 914 F.2d at 1170 (finding in 1990 that Smith had exhausted his claims before bringing the habeas petition). In addition, Montana did not raise this argument below. In its response to Smith's habeas petition, it stated: "No claim is made by respondents that petitioner has not exhausted his state remedies with respect to the claims presented here."

pleaded guilty and would have insisted on going to trial." *Hill v. Lockhart*, 474 U.S. 52, 59 (1985).

## A

We hold that Smith's defense attorney's performance fell below an objective standard of reasonableness because he failed to investigate the facts of the crime, failed to investigate Smith's mental state at the time of the crime, and failed to discuss possible defenses before Smith pled guilty.

**[1]** *Strickland* held that "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691. The *Strickland* standard is a deferential one. *Id.* at 689 ("Judicial scrutiny of counsel's performance must be highly deferential."). Because "[a] standard of reasonableness applied as if one stood in counsel's shoes spawns few hard-edged rules," *Rompilla v. Beard*, 545 U.S. 374, 381 (2005), reasonableness determinations are made on a case-by-case basis.

**[2]** Montana contends that Smith's strong intention to plead guilty eliminated his defense counsel's duty to fully investigate the circumstances of the crime. A decision not to investigate must be reasonable under the specific circumstances of the case. "The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions." *Strickland*, 466 U.S. at 691. Smith's intent to plead guilty mitigated, but did not eliminate, his attorney's duty to reasonably investigate. *See Langford v. Day*, 110 F.3d 1380, 1386-87 (9th Cir. 1996).

Despite Smith's insistence on pleading guilty, his defense attorney failed to adequately investigate the circumstances of the crime. "[T]he prevailing legal norms at the time" govern determinations on reasonable representation. *Jennings v. Woodford*, 290 F.3d 1006, 1015 (9th Cir. 2002). By 1982, the

ABA had released criminal justice standards requiring a defense attorney to thoroughly investigate the circumstances of a case, even in the face of guilt statements by the defendant:

> It is the duty of the lawyer to conduct a prompt investigation of the circumstances of the case and to explore all avenues leading to facts relevant to the merits of the case and the penalty in the event of conviction. The investigation should always include efforts to secure information in the possession of the prosecution and law enforcement authorities. *The duty to investigate exists regardless of the accused's admissions or statements to the lawyer of facts constituting guilt or the accused's stated desire to plead guilty.*

1 American Bar Association, Standards for Criminal Justice 4-4.1 (2d ed. 1982 Supp.) (emphasis added); *see also Duncan*, 528 F.3d at 1238 ("A defendant's admission of guilt to his lawyer does not absolve the lawyer of his duty to investigate the crime."). ABA standards act "as 'guides to determining what is reasonable.' " *Rompilla*, 545 U.S. at 387 (quoting *Wiggins v. Smith*, 539 U.S. 510, 524 (2003)). A lawyer's duty to fully investigate the circumstances of a crime—even when his client has admitted guilt—is especially pronounced in the death context, where consequences of the lawyer's inaction can be particularly severe.

Despite this duty, Smith's lawyer neither reasonably investigated Smith's mental state at the time of the murder not did he reasonably investigate the factual circumstances of the murders.

**[3]** Smith and his lawyer had many conversations leading up to Smith's guilty plea. They spoke about Smith's drug usage over "many years." Despite this, the lawyer did not investigate Smith's history with drug use. Furthermore, he did

not learn of Smith's drug use leading up to the murders until after the first sentencing. Smith also spoke with his lawyer about his desire to seek the death penalty. That desire, whether couched in reasoned argument or not, should have put the defense lawyer on notice that Smith might have mental health problems.[4] Yet the lawyer did not order a psychiatric evaluation nor did he seek a release of confidential information about Smith's educational, corrective, or mental health background. When a lawyer is on notice that his client may have mental health or drug abuse problems, he does not offer reasonable representation if he fails to investigate those potentially mitigating circumstances. *See Jennings*, 290 F.3d at 1013-17.

The defense lawyer engaged in almost no investigation of the facts of the crime either. The lawyer interviewed "about four or five" of the thirty-five potential witnesses attached to the charging document. The lawyer never visited the scene of the crime or hired an investigator. The defense lawyer himself

---

[4][M]ental health issues are . . . ubiquitous in capital defense." American Bar Association, Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases 31 (2003), available at http://www.abanet.org/legalservices/downloads/sclaid/indigentdefense/deathpenaltyguidelines2003.pdf. Mental illness can be difficult for non-mental health professionals to detect. Recognizing this fact, the ABA in 2003 issued guidelines on mental illness detection in capital cases:

> *Counsel's own observations of the client's mental status, while necessary, can hardly be expected to be sufficient to detect the array of conditions (e.g., post-traumatic stress disorder, fetal alcohol syndrome, pesticide poisoning, lead poisoning, schizophrenia, mental retardation) that could be of critical importance.* Accordingly, Subsection A (2) mandates that at least one member of the defense team (whether one of the four individuals constituting the smallest allowable team or an additional team member) be a person qualified by experience and training to screen for mental or psychological disorders or defects and recommend such further investigation of the subject as may seem appropriate.

*Id.* (emphasis added). Of course, these standards were not the "prevailing legal norms at the time" of Smith's first sentencing.

conceded that he "did not feel a need to go beyond anything that Mr. Smith" told him.

In addition to a duty to investigate, defense counsel must ensure that the defendant understands his plea. A defendant must possess "an understanding of the law in relation to the facts." *Boykin v. Alabama*, 395 U.S. 238, 243 n.5 (1969). A guilty plea is only valid if it "represents a voluntary and intelligent choice among the alternative courses of action open to the defendant." *North Carolina v. Alford*, 400 U.S. 25, 31 (1970).

[4] Smith's defense attorney did not ensure that Smith fully understood the alternative courses of action available to him. Although Smith's lawyer was on notice that Smith had been a habitual drug user and that he wanted to die—both facts that might have developed into mitigating circumstances with the right investigation—Smith's lawyer conceded that he did not discuss with Smith "anything that would have operated as a viable defense in the case."[5]

Montana further contends that Smith's lawyer's decision not to request a psychiatric evaluation was a strategic choice and thus subject to little judicial oversight. The defense lawyer stated that his decision was strategic because he would have had to tender the results of the evaluation to the prosecution. "Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.' " *Strickland*, 466 U.S. at 689 (quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)).

---

[5]Although we ultimately conclude that Smith would have had difficulty prevailing on intoxication and emotional stress defenses in Montana court, he could have used those facts as mitigating circumstances during his initial sentencing.

SMITH V. MAHONEY                    9957

However, any strategic decision must be reasonable. *Jennings*, 290 F.3d at 1014 ("Although defense counsel is empowered to make such strategic decisions, *Strickland* demands that such decisions be reasonable and informed."). "[D]ecisions that are made before a complete investigation is conducted are reasonable only if the level of investigation was also reasonable." *Duncan*, 528 F.3d at 1234. Read with the rest of the attorney's testimony, his statement on strategy appears to be more of an afterthought than anything else, and additionally does not make sense. Smith could not have been harmed had the evaluation turned up evidence that Smith suffered from a psychiatric condition and the prosecution found out about it. Had the evaluation turned up no evidence of psychiatric problems, the sentencing would have proceeded as it did.

**[5]** Because Smith's defense lawyer failed to investigate Smith's mental state at the time of the crime, failed to investigate the facts surrounding the crime, and failed to discuss possible defenses with Smith, his representation fell below an objective standard of reasonableness given the prevailing legal norms at the time.

### B

Under *Strickland*, it is not enough to establish that counsel was constitutionally ineffective; the petitioner must also establish prejudice. Although Smith's lawyer's performance was unreasonable, Smith did not establish that he was prejudiced by his lawyer's representation.

**[6]** To show prejudice in the plea context, Smith must demonstrate that "there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Hill*, 474 U.S. at 59. "[W]here the alleged error of counsel is a failure to advise the defendant of a potential affirmative defense to the crime charged, the resolution of the 'prejudice' inquiry will depend

largely on whether the affirmative defense likely would have succeeded at trial." *Id.*; *see also United States v. Keller*, 902 F.2d 1391, 1395 (9th Cir. 1990).

**[7]** To have convicted Smith of a crime punishable by death, Montana would have had to prove that Smith "purposely or knowingly" committed the murders. Mont. Code Ann. § 45-5-102 (deliberate homicide); § 45-5-303 (aggravated kidnapping). At the time of Smith's first sentencing, Montana allowed juries to consider intoxication as a defense to the mental state requirements of those crimes. The relevant statute read:

> A person who is in an intoxicated or drugged condition is criminally responsible for conduct unless such condition is involuntarily produced and deprives him of his capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law. An intoxicated or drugged condition may be taken into consideration in determining the existence of a mental state which is an element of the offense.

Mont. Code Ann. § 45-2-203 (1985) (amended in 1987 to preclude a jury from taking intoxication into account when considering mental state). At the time, voluntary intoxication could be taken into consideration when determining whether Smith had the requisite mental state while committing the murders. *State v. Sage*, 717 P.2d 1096, 1100 (Mont. 1986).

In addition, a person who "purposely or knowingly causes the death of another human being but does so under the influence of extreme mental or emotional stress for which there is reasonable explanation or excuse" commits only mitigated deliberate homicide, which carries a penalty of between two and forty years in prison. Mont. Code Ann. § 45-5-103. In Montana, "mitigated deliberate homicide is not a lesser included offense of deliberate homicide in the traditional

sense, but rather is an affirmative defense that must be proven by the defendant by a preponderance of the evidence." *State v. Howell*, 954 P.2d 1102, 1104 (Mont. 1998).

Smith has always admitted that he killed Thomas Running Rabbit, Jr. and Harvey Mad Man, Jr. At the first plea hearing, Smith testified that he was not impaired in any way when he committed the murders and affirmed that he was "of a cold and calculating mind" when he pulled the trigger. In addition to wanting to steal the car, he said he killed the men because he "had kind of a morbid facination to find out what it would be like to kill somebody." The record establishes that Smith was calm and collected during the murders. Following the killing, he drove to California.

**[8]** Although Smith had been drinking beer the day of the murders and using drugs in the two weeks preceding the murders, it is far from clear that Smith could have successfully employed the intoxication defense. Montana courts have held that "a jury may infer the requisite mental state from what a 'defendant does and says and from all the facts and circumstances involved.' " *Sage*, 717 P.2d at 1100 (quoting *State v. Pierce*, 647 P.2d 847, 851 (Mont. 1982)). A Montana jury could have inferred the requisite mental state from Smith's clear description of the murders, his calm demeanor, and his testimony concerning his intent. Further, the Montana Supreme Court has held that a defendant's "own recitation of the facts surrounding the homicide at the entry of a guilty plea" is important in evaluating proof of the requisite mental state, particularly when the statement "indicates a clear case of criminal responsibility." *State v. White,* 632 P.2d 1118, 1121 (Mont. 1981). The very few cases in which voluntary intoxication appeared to play a part in determining *mens rea* did not involve admission of deliberate homicide. *See, e.g.*, *Sage*, 717 P.2d at 1100 (considering a case in which no motive was established and the defendant claimed that the weapon was accidentally discharged). Given the state of Montana law at the time of the plea, Smith's own testimony, and

testimony of other percipient witnesses, Smith had little to no chance of prevailing on an affirmative defense that his voluntary intoxication negated the required *mens rea.*

Smith cites *State v. Azure*, 573 P.2d 179 (Mont. 1977), for the proposition that intoxication would have been a valid defense to deliberate homicide. *Azure* is not directly on point. The Montana Supreme Court reversed a lower court's decision not to allow Azure to withdraw his guilty plea after Azure learned that his intoxication might have served as a defense against the charge of deliberate homicide. *Id.* at 183-84. The court did not evaluate the plausibility of such a defense; it only held that a defendant should have the chance to withdraw his plea once he learns that such a defense is possible. Smith never sought to withdraw his plea.

**[9]** Smith also would have little chance of successfully asserting that he was "under the influence of extreme mental or emotional stress for which there is reasonable explanation or excuse" at the time of the murders. During the 1995 evidentiary hearing, Dr. Evans testified that at the time of the crime, Smith was "definitely" "suffering from or under the influence of extreme emotional disturbance." However, Montana law requires more for a defendant to qualify for mitigated deliberate homicide. The Montana Supreme Court has held that the mitigated deliberate homicide defense "require[s] an extreme emotional stress resulting from *provocation* of some sort, in the form of a reasonable excuse or explanation." *Hans v. State*, 942 P.2d 674, 686 (Mont. 1997) (emphasis added). In *State v. Buckley*, 557 P.2d 283 (Mont. 1976), the Montana Supreme Court approved the withdrawal of a mitigated deliberate homicide jury instruction because the record showed that the defendant, though under gunfire, did not act "excitedly" but rather with the demeanor of "a slow, deliberate, calm, and cool killer." *Id.* at 285. This evidence was enough for the court to conclude that "the district court was correct in finding there was no evidence of extreme mental or emotional stress." *Id.* The Montana Supreme Court has also held that the miti-

SMITH V. MAHONEY                    9961

gated deliberate homicide defense is not satisfied by showing mere intoxication. The defense requires "extreme mental or emotional distress." *Howell*, 954 P.2d at 1105; *see also State v. Martin*, 23 P.3d 216, 221 (Mont. 2001) ("[W]e have repeatedly determined that evidence of a defendant's anger or intoxication is insufficient to warrant an instruction on mitigated deliberate homicide.").

**[10]** The record in this case shows that Smith was not under any observable extreme mental or emotional distress when he committed the murders. He was never provoked. During his testimony, he affirmed that he was "of a cold and calculating mind" when he pulled the trigger. Smith had little to no chance of qualifying for mitigated deliberate homicide.

Smith cites evidence in the record that had he known about his potential defenses, he would not have pled guilty. Smith relies on a statement he made at an evidentiary hearing to support his contention that he would have gone to trial if he thought he had a viable defense: "I was pleading guilty, basically, because I saw no other alternatives. . . . There was no question of my guilt, but the main reason for pleading guilty was all my options had run out as far as I knew." This post hoc statement does not overcome the record evidence that Smith was determined, for a variety of reasons, to plead guilty.

**[11]** We have previously held that prejudice does not generally exist when a defendant chooses to plead guilty. *See Lambert v. Blodgett*, 393 F.3d 943, 980 (9th Cir. 2004) ("[I]f Lambert chose to plead guilty of his own accord and for his own reasons, with full knowledge of the consequences of his plea, it is unlikely that [his attorney] could have provided any information which would have dissuaded him."). *Langford v. Day* provides a useful comparison. Langford was accused of deliberate homicide, aggravated kidnapping, aggravated burglary, robbery, and theft. *Langford*, 110 F.3d at 1383. After seeking a sentence of death and receiving it, Langford

9962          SMITH V. MAHONEY

obtained new counsel and moved to withdraw his guilty pleas.
He claimed ineffective assistance of counsel and stated "that
he would not have pleaded guilty if he had known that legal
arguments could have been made." *Id.* at 1384.

Like Smith, Langford "strongly and repeatedly insisted on
pleading guilty and seeking the death penalty," a fact the
*Langford* panel found to "overshadow[ ] this case." *Id.* The
panel noted that

> the record strongly supports the determination of the
> state courts and the district court that, even if Lang-
> ford had been advised as his present counsel now
> urges, and even if he had been offered a defense psy-
> chiatrist, he would have pleaded guilty anyway.
> Once it was clear that MacKay could not guarantee
> that Langford would not spend a long time in prison,
> Langford was determined and unequivocal in his
> decision to plead guilty and seek the death penalty.
> Unlike decisions about trial strategies, the decision
> to plead guilty was Langford's to make, and Mon-
> tana's Rules of Professional Conduct bound MacKay
> to that decision.

*Id.* at 1388.[6] For that reason, the *Langford* panel concluded
that "Langford utterly fails to meet [the prejudice] require-
ment." *Id.*

[12] The record in this case shows that Smith was similarly
determined to plead guilty and seek the death penalty. Indeed,
his defense attorney testified that he spent much time speak-
ing with Smith about his decision. His attorney stated that
"Mr. Smith was extraordinarily persuasive. He had relatively

---

[6]The Supreme Court has let death sentences stand when defendants
have sought the death penalty and took no adversarial action at trial. *See
Hammett v. Texas*, 448 U.S. 725 (1980); *Lenhard v. Wolff*, 444 U.S. 807
(1979).

SMITH V. MAHONEY                    9963

lengthy discussions with both myself and Mr. Moore as to why he was seeking the death penalty." Smith corroborated this account. Smith stated that he and his attorney "talked about [his decision to pursue the death penalty], but it was mostly my convincing him that it was the right idea to do it that way. There wasn't a lot of input from [the defense lawyer's] side of things." Like Langford, Smith was "determined and unequivocal in his decision to plead guilty and seek the death penalty." *Langford*, 110 F.3d at 1388. In such cases, where "the defendant has his own reasons for pleading guilty," relief is not warranted. *McMann v. Richardson*, 397 U.S. 759, 767 (1970). Smith was not only unequivocal about his plea, he had rejected a favorable plea bargain.

We have also held that the petitioner was not prejudiced by his counsel's performance when the petitioner "never denied his acts or suggested pleading not guilty." *Keller*, 902 F.2d at 1394. Smith has never denied his guilt—in fact, he has admitted to it more than once—or sought to withdraw his plea.

**[13]** We do not excuse Smith's defense attorney's failure to "investigate, develop and present the wealth of evidence available concerning [petitioner's] troubled background and his emotional stability and what led to the development of the person who committed the crime," *Ainsworth v. Woodford*, 268 F.3d 868, 878 (9th Cir. 2001). In addition, the record establishes that Smith was independently adamant on pleading guilty and has never argued that he did not commit the crimes. Therefore, he has not established the prejudice necessary to sustain an ineffective assistance of counsel claim.

III

Smith also challenges his 1995 death sentence on three grounds: (1) the sentencing judge failed to consider mitigating evidence of proportionality, (2) the sentencing judge was biased against Smith, and (3) the sentence, in conjunction with the twenty-five years Smith has spent on death row, vio-

lates the Eighth Amendment's prohibition against cruel and
unusual punishment. We conclude that the district court cor-
rectly denied these claims.

### A

As a preliminary matter, Montana argues that AEDPA bars
Smith's claims. First, Montana argues that we lack jurisdic-
tion over the claims because Smith failed to satisfy AEDPA's
Certificate of Appealability requirements. Second, Montana
argues that Smith failed to challenge his 1995 death sentence
within AEDPA's statute of limitations. The district court held
that AEDPA did not apply to Smith's amended habeas peti-
tion. We agree.

### 1

Contrary to Montana's assertion, we have jurisdiction over
Smith's challenges to his 1995 death sentence. When the fed-
eral district court denied Smith's petition in 1994, Smith filed
a notice of appeal and obtained a Certificate of Probable
Cause ("CPC").[7] Montana now argues that we lack jurisdic-
tion over Smith's 1995 death sentence claims because he has
not obtained Certificates of Appealability for those claims.
Montana's argument fails.

[14] AEDPA precludes an appeal from a final order in a
federal habeas proceeding unless a circuit justice or judge
issues a certificate of appealability ("COA"). 28 U.S.C.
§ 2253(c)(1). Under AEDPA, a judge may only issue a COA
"if the applicant has made a substantial showing of the denial
of a constitutional right." *Id.* § 2253(c)(2). The COA "shall

---

[7]Before the passage of the AEDPA, 28 U.S.C. § 2253 required state
prisoners seeking to appeal denials of habeas relief to obtain a Certificate
of Probable Cause, which could be issued if the prisoner made a substan-
tial showing of the denial of a federal right. *Fuller v. Roe*, 182 F.3d 699,
702 (9th Cir. 1999).

indicate which specific issue or issues satisfy the [required] showing." *Id.* § 2253(c)(3).

**[15]** However, the COA requirement imposed by AEDPA "applies to appellate proceedings initiated post-AEDPA." *Slack v. McDaniel*, 529 U.S. 473, 481 (2000). The instant "appellate proceeding" was initiated pre-AEDPA. Three days after the federal district court denied Smith's ineffective assistance of counsel claim in January 1994, Smith initiated this appeal. The appeal received its docket number at that time. We then stayed the appeal pending Smith's state resentencing. Although Smith appealed the denial of his amended 2002 habeas petition after AEDPA's effective date, that appeal did not re-initiate a new proceeding; the proceeding had been initiated in 1994, before AEDPA was enacted. Thus, AEDPA's COA requirements do not apply to Smith's current appeal.

**[16]** Before AEDPA, an appellate court was free to consider issues not listed in the CPC. *Van Pilon v. Reed*, 799 F.2d 1332, 1335 (9th Cir. 1986) ("[T]he scope of our review cannot be limited by a certificate of probable cause."). Because Smith obtained a CPC for one of his claims, "the district court [has] notifie[d] this court that in its opinion the petitioner is not abusing the writ through frivolous litigation." *Id.* Therefore, the CPC Smith received from the district court in 1994 confers jurisdiction onto this panel to consider all of Smith's claims.[8]

2

For similar reasons, we conclude that AEDPA's statute of limitations does not bar Smith's claims. In 1987, Smith challenged his 1984 death sentence in a petition for habeas relief.

---

[8]Montana argues that because Smith moved for a COA on his more recent claims he is precluded from now arguing that he did not need a COA. However, nowhere in Smith's motion for a COA did Smith concede that AEDPA applied to this appeal.

9966                          SMITH v. MAHONEY

In 2002, Smith amended his petition to include claims chal-
lenging the 1995 death sentence. Montana now argues that
Smith's amended petition was untimely under AEDPA.

  AEDPA imposes a one year statute of limitations on habeas
petitions from the date the state judgment became final, not
including time for post-conviction review. 28 U.S.C.
§ 2244(d). Smith argues that AEDPA's statute of limitations
does not apply to his amended petition because he filed his
original habeas petition in 1986, before AEDPA was enacted.
Montana argues that unless Smith's amended petition relates
back to his original petition, AEDPA's statute of limitations
applies. If AEDPA's statute of limitations applies to Smith's
amended petition, his petition would be time-barred.

  [17] AEDPA's statute of limitations does not apply to
pending cases filed before the date that AEDPA took effect.
In *Lindh v. Murphy*, 521 U.S. 320 (1997), the Court stated
that AEDPA "reveals Congress's intent to apply the amend-
ments to chapter 153 only to such *cases* as were filed after
[AEDPA's] enactment . . . ." *Lindh*, 521 U.S. at 326 (empha-
sis added); *see also Jeffries v. Wood*, 114 F.3d 1484, 1499
(9th Cir. 1997) (en banc). The Supreme Court later explained
that "we held in *Lindh* that the new provisions of chapter 153
of Title 28 do not apply to *cases* pending as of the date
AEDPA became effective." *Woodford v. Garceau*, 538 U.S.
202, 205 (2003); *see also Jackson v. Brown*, 513 F.3d 1057,
1069 (9th Cir. 2008) (general AEDPA provisions did not
apply to petition because it was filed before AEDPA's effec-
tive date).

  The consistent use of the word "case" rather than "petition"
or "application" suggests that the relation back doctrine does
not govern AEDPA's application to amended habeas peti-
tions. Although Smith's amended petition does not relate back
to his original petition, it is part of the same *case*.[9] In 2002,

───────────────

  [9]The Supreme Court has defined a "case" as "a claim 'brought before
the court(s) for determination by such regular proceedings as are estab-

SMITH V. MAHONEY                    9967

we permitted Smith to amend his petition; we did not force
him to commence another case against Montana.

Montana urges us to adopt the relation back doctrine, set
out by Rule 15(c) of the Federal Rules of Civil Procedure, to
determine whether AEDPA applies to the amended petition.
Rule 15 states that "[a]n amendment to a pleading relates back
to the date of the original pleading when the amendment
asserts a claim or defense that arose out of the conduct, trans-
action, or occurrence set out—or attempted to be set out—in
the original pleading . . . ." Fed. R. Civ. P. 15(c). Montana
cites *Mayle v. Felix*, 545 U.S. 644 (2005), in support of its
argument that a strict form of the relation back doctrine
applies here. *See id.* at 650 ("An amended habeas petition . . .
does not relate back (and thereby escape AEDPA's one-year
time limit) when it asserts a new ground for relief supported
by facts that differ in both time and type from those the origi-
nal pleading set forth.").

*Mayle* is inapposite. In *Mayle*, the petitioner's original
habeas petition was filed after AEDPA's effective date. The
petition was therefore already subject to AEDPA's require-
ments. That AEDPA already applied to the petition influenced
the Court's decision to apply a modified version of the rela-
tion back doctrine. *See id.* at 662 ("If claims asserted after the
one-year period could be revived simply because they relate
to the same trial, conviction, or sentence as a timely filed
claim, AEDPA's limitation period would have slim signifi-
cance."); *id.* at 663 ("Given AEDPA's 'finality' and 'federal-
ism' concerns, it would be anomalous to allow relation back
under Rule 15(c)(2) based on a broader reading of the words
'conduct, transaction, or occurrence' in federal habeas pro-

---

lished by law or custom for the protection or enforcement of rights, or the
prevention, redress, or punishment of wrongs.' " *Calderon v. Ashmus*, 523
U.S. 740, 746 (1998) (quoting *Fairchild v. Hughes*, 258 U.S. 126, 129
(1922)).

ceedings than in ordinary civil litigation." (citations omitted)).
*Mayle* thus resolved the question of how to interpret the rela-
tion back doctrine within the context of AEDPA's intents and
constraints. The question in this case is quite different:
whether AEPDA applies to Smith's amended petition at all,
given that it does not apply to his original petition.

[18] Under the plain language of the Supreme Court in
*Lindh*, an amended petition filed after AEDPA was enacted is
not subject to AEDPA's statute of limitations as long as the
amendment is part of a case pending at the time AEDPA was
enacted. This conclusion is consistent with the treatment we
have afforded such petitions in similar circumstances. *See,
e.g.*, *Allen v. Roe*, 305 F.3d 1046, 1049-50 (9th Cir. 2002)
(holding that because petitioner filed his original habeas peti-
tion before AEDPA, his amended petition was governed by
pre-AEDPA law); *Mancuso v. Olivarez*, 292 F.3d 939, 949
(9th Cir. 2002) (holding under *Lindh* that review of the
amended petition was governed by pre-AEDPA standards and
precedent because Mancuso filed his petition prior to the
effective date of AEDPA); *Anthony v. Cambra*, 236 F.3d 568,
576-77 (9th Cir. 2000) (holding that the petitioner escaped
AEDPA's time limits because his amended post-AEDPA peti-
tion related back to his original pre-AEDPA petition).[10]

[19] Thus, under the circumstances presented here,
because Smith's habeas case was pending when AEDPA was

---

[10]We have held that an amended habeas petition does not relate back to
a petition that was dismissed for failure to exhaust state remedies. *See
Tuan Van Tran v. Lindsey*, 212 F.3d 1143, 1148-49 (9th Cir. 2000) (hold-
ing that an amended petition cannot relate back to a pre-AEDPA petition
if that first petition was dismissed for failure to exhaust state remedies),
*overruled on other grounds by Lockyer v. Andrade*, 538 U.S. 63 (2003);
*Green v. White*, 223 F.3d 1001, 1003 (9th Cir. 2000) ("A second habeas
petition does not relate back to a first habeas petition when the first habeas
petition was dismissed for failure to exhaust state remedies."). However,
the original petition here does not contain those procedural deficiencies
and was not dismissed on those grounds.

enacted, his amended petition is not subject to AEDPA's statute of limitations.

### B

For the foregoing reasons, we evaluate the merits of Smith's claims under pre-AEDPA standards. Habeas relief may be granted "only on the ground that [petitioner] is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). A state court "determination after a hearing on the merits of a factual issue" should be presumed correct unless the petitioner can establish error. *Id.* § 2254(d)(1)-(8) (listing the types of error). When a habeas petitioner does not establish, the respondent will not admit, and the federal court does not find, any one or more of the conditions listed by § 2254(d) (1)-(8), "the burden shall rest upon the applicant to establish by convincing evidence that the factual determination by the State court was erroneous." *Id.* § 2254(d).

We review the district court's decision to deny a 28 U.S.C. § 2254 habeas petition de novo, *Benitez v. Garcia*, 449 F.3d 971, 974 (9th Cir. 2006), and we are not bound by the reasoning of the district court, *Buckley v. Terhune*, 441 F.3d 688, 694 (9th Cir. 2006) (en banc).

### 1

[20] The district court did not err in denying Smith's claim that the state court unconstitutionally declined to consider mitigation evidence. At his 1995 sentencing hearing, Smith presented evidence that a sentence of death would be disproportionate to the sentences imposed on other defendants convicted of aggravated homicide in Montana. Judge Larson did not specifically consider that mitigation evidence in his death sentence. On direct appeal, the Montana Supreme Court conducted a proportionality review, as mandated by Montana statute, Mont. Code Ann. § 46-18-310, and found that Smith's

death sentence was not "excessive or disproportionate to the penalty imposed in similar cases." *Smith*, 931 P.2d at 1286.

Smith argues that this review violated *Lockett v. Ohio*, 438 U.S. 586 (1978). However, in *Lockett*, the Supreme Court held only that sentencing courts must consider mitigating evidence when it includes "any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Id.* at 604. Sentence proportionality is not mitigating evidence of that type. The Court also held that "[n]othing in this opinion limits the traditional authority of a court to exclude, as irrelevant, evidence not bearing on the defendant's character, prior record, or the circumstances of his offense." *Id.* at 604 n.12. Moreover, "[w]hat is important at the selection stage is an *individualized* determination on the basis of the character of the individual and the circumstances of the crime." *Zant v. Stephens*, 462 U.S. 862, 879 (1983). These statements suggest that non-character, non-circumstance evidence need not factor into the constitutionality of a death sentence.

Our decision in *Beardslee v. Woodford*, 358 F.3d 560 (9th Cir. 2004) is instructive. In *Beardslee*, we rejected the petitioner's claim that his co-defendants' lesser sentences must be considered as mitigating evidence. The petitioner argued that his co-defendants' sentences were circumstance evidence within the meaning of that term in *Lockett*. *Id.* at 579. We rejected that argument and held that "[a]lthough a trial court is not necessarily precluded from allowing consideration of co-defendant sentences, a trial court does not commit constitutional error under *Lockett* by refusing to allow such evidence." *Id.* at 579.

**[21]** Smith's argument fails because neither the Ninth Circuit nor the Supreme Court has ever held that a sentencing court must consider mitigating evidence of the type Smith presented.

2

Smith's second challenge to his 1995 death sentence is that Judge Larson was biased against Smith because he considered both the testimony of Dr. Stratford—the original psychologist whose evaluation was rejected by the Ninth Circuit—and the prior three death sentences in reaching his judgment. Smith also contends that Judge Larson issued his sentence under the influence of passion, prejudice, and other arbitrary factors as evidenced by remarks he made to the press. The district court denied Smith's request for an evidentiary hearing on judge bias.

A habeas petitioner "is not entitled to discovery as a matter of ordinary course." *Bracy v. Gramley*, 520 U.S. 899, 904 (1997). Rule 6(a) of the Rules Governing § 2254 Cases states that "[a] party shall be entitled to invoke the processes of discovery available under the Federal Rules of Civil Procedure if, and to the extent that, the judge in the exercise of his discretion and for good cause shown grants leave to do so, but not otherwise." U.S.C. § 2254 Cases R. 6(a). Good cause exists "where specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is . . . entitled to relief . . . ." *Bracy*, 520 U.S. at 908-09 (quoting *Harris v. Nelson*, 394 U.S. 286, 300 (1969) (alteration in original)). Where good cause exists, "it is the duty of the court to provide the necessary facilities and procedures for an adequate inquiry." *Harris*, 394 at 300.

We review the district court's denial of discovery and an evidentiary hearing for abuse of discretion. *See Beardslee*, 358 F.3d at 573. "[A] district court abuse[s] its discretion in not ordering Rule 6(a) discovery when discovery [i]s 'essential' for the habeas petitioner to 'develop fully' his underlying claim." *Dung The Pham v. Terhune*, 400 F.3d 740, 743 (9th Cir. 2005) (quoting *Jones v. Wood*, 114 F.3d 1002, 1009 (9th Cir. 1997)). Smith need not "demonstrate that he will ulti-

9972                    SMITH V. MAHONEY

mately prevail on his underlying" claim. *Id.* However, an evi-
dentiary hearing is not required "on issues that can be
resolved by reference to the state court record." *Campbell v.
Wood*, 18 F.3d 662, 679 (9th Cir. 1994).

**[22]** The Due Process clause "requires a fair trial in a fair
tribunal before a judge with no actual bias against the defen-
dant or interest in the outcome of his particular case." *Bracy*,
520 U.S. at 904-05 (internal quotation marks and citations
omitted). "[O]nly in the most extreme of cases would disqual-
ification on [the basis of judge bias] be constitutionally
required . . . ." *Aetna Life Ins. Co. v. Lavoie*, 475 U.S. 813,
821 (1986).

**[23]** Smith's judge bias claims, even if fully developed, do
not rise to the level of constitutional violations. Smith's first
claim is that Judge Larson improperly relied upon the testi-
mony of Dr. Stratford. Judge Larson did reference Dr. Strat-
ford in his opinion. However, he did so in the context of a
recitation of historical facts. As the district court found, "there
is absolutely no evidence that Judge Larson went outside the
record and relied upon the report or testimony of Dr. Strat-
ford." As the district court aptly noted, Judge Larson stated
the bases for his findings with particularity and did not men-
tion Dr. Stratford's medical opinion to support any of his
findings.

Smith's second claim is that Judge Larson was biased
against Smith by familiarizing himself with the previous death
sentences in the case. Nothing in Judge Larson's opinion sug-
gests that he was biased by Smith's previous sentences. No
rule of constitutional law prohibits a judge from acquainting
himself with the procedural history of his case.

Finally, Smith claims that Judge Larson revealed his bias
in comments he made to the press about Smith's case. How-
ever, Judge Larson's comments in the newspaper consisted of
two innocuous statements about attorneys' fees. Smith also

contends that Judge Larson was influenced by incendiary articles in the press and by another judge who had been recused from hearing Smith's case and who shared office space with Judge Larson. Smith tenders no evidence, aside from speculation, that Judge Larson was influenced by the press or by another judge.

**[24]**  Because Smith has failed to develop his claim of judicial bias sufficiently to warrant an evidentiary hearing, the district court did not abuse its discretion in declining to hold one.

3

Finally, Smith argues that his continued incarceration violates the Eighth Amendment. Such a claim is termed a "*Lackey*" claim after *Lackey v. Texas*, 514 U.S. 1045 (1995), a death penalty case that the Supreme Court declined to hear. In *Lackey*, the petitioner brought an Eighth Amendment claim similar to the one Smith brings now. Justice Stevens, joined by Justice Breyer, issued a memorandum "respecting the denial of certiorari" but stating that the Eighth Amendment claim "seems an ideal example of one which would benefit from [ ] further study." *Id.* at 1047.

*Lackey* claims are grounded in the constitutional principles that constrain the death penalty. While the death penalty can be justified by "retribution and deterrence of capital crimes by prospective offenders," an execution "cannot be so totally without penological justification that it results in the gratuitous infliction of suffering." *Gregg v. Georgia*, 428 U.S. 153, 183 (1976) (plurality opinion). Justice White, concurring in *Furman v. Georgia*, 408 U.S. 238 (1972), opined that

> At the moment that [a proposed execution] ceases realistically to further these purposes [of deterrence and the coherent expression of moral outrage], the emerging question is whether its imposition in such

9974                         SMITH v. MAHONEY

> circumstances would violate the Eighth Amendment.
> It is my view that it would, for its imposition would
> then be the pointless and needless extinction of life
> with only marginal contributions to any discernible
> social or public purposes. A penalty with such negli-
> gible returns to the State would be patently excessive
> and cruel and unusual punishment violative of the
> Eighth Amendment.

*Furman*, 408 U.S. at 312 (White, J., concurring). Smith con-
tends that his four sentences in combination with his twenty-
five years on death row satisfied any need for retribution and
deterrence and that any penalty beyond such punishment vio-
lates the Eighth Amendment.

   Montana responds that Smith asks for a new rule of consti-
tutional law. Courts may not announce new rules of constitu-
tional law on habeas review. *Teague v. Lane*, 489 U.S. 288,
316 (1989) ("[H]abeas corpus cannot be used as a vehicle to
create new constitutional rules of criminal procedure unless
those rules would be applied retroactively to all defendants on
collateral review through one of the two exceptions we have
articulated."). A case announces a new rule "when it breaks
new ground or imposes a new obligation on the States or the
Federal Government . . . [or] if the result was not dictated by
precedent existing at the time the defendant's conviction
became final." *Teague*, 489 U.S. at 301. The relevant inquiry
is "whether a state court considering [Smith's] claim at the
time his conviction became final would have felt compelled
by existing precedent to conclude that the rule [Smith] seeks
was required by the Constitution." *Saffle v. Parks*, 494 U.S.
484, 488 (1990).

   **[25]** We have rejected *Lackey* claims in the past. *In Allen
v. Ornoski*, 435 F.3d 946 (9th Cir. 2006), we determined, in
the context of AEDPA, that "[t]he Supreme Court has never
held that execution after a long tenure on death row is cruel
and unusual punishment." *Id.* at 958; *see also Knight v. Flor-*

Smith v. Mahoney                              9975

*ida*, 528 U.S. 990 (1999) (Thomas, J., concurring in denial of certiorari) ("I am unaware of any support in the American constitutional tradition or in this Court's precedent for the proposition that a defendant can avail himself of the panoply of appellate and collateral procedures and then complain when his execution is delayed."); *McKenzie v. Day*, 57 F.3d 1461, 1470 (9th Cir. 1995) (casting doubt on the contention that "the inordinate delay in carrying out the sentence of death, regardless of any other factor, conclusively establishes that he has suffered cruel and unusual punishment").

**[26]** In sum, a state court considering Smith's Eighth Amendment claim at the time his conviction became final would not have felt compelled by existing precedent to conclude that the rule sought was required by the Constitution. *See Saffle*, 494 U.S. at 488. Enforcing the rule proposed by Smith would therefore "break[ ] new ground or impose[ ] a new obligation on the States," *Teague*, 489 U.S. at 301, and we must therefore reject it.

IV

By all accounts, Smith has reformed his life. He has developed strong relationships with various members of his family and has taken advantage of the educational opportunities offered by the prison that houses him. He has expressed deep regret for his deplorable actions. However, consideration of these issues are beyond our jurisdiction in this case. Clemency claims are committed to the wisdom of the executive branch. On the legal issues presented to us, we affirm the judgments of the district court denying Smith's petition for a writ of habeas corpus.

**AFFIRMED.**

9976                          SMITH v. MAHONEY

B. Fletcher, Circuit Judge, dissenting:

Smith is set to be executed by the State of Montana because, at his arraignment twenty-seven years ago, he pleaded guilty and requested the death penalty. Had he instead accepted the plea bargain offered by the Flathead County Attorney, he might well be a free man today.[1] Because there is a reasonable probability that Smith would have made a different decision had he been provided with effective counsel, I respectfully dissent.

## I.  *There is a Reasonable Probability that, Had He Been Provided with Effective Assistance, Smith Would Have Gone to Trial*

Guilty pleas must be knowing and voluntary. *See Puckett v. United States*, 129 S. Ct. 1423, 1429 (2009). Smith's fateful decision to plead guilty and seek the death penalty was neither. At the time of the arraignment, he was deeply depressed because he had been in solitary confinement for some time and subjected to harsh living conditions. He had received death threats from Native American inmates and believed that he would be killed in prison. Most importantly, his attorney was manifestly ineffective. *See Hill v. Lockhart*, 474 U.S. 52, 56 (1985) ("[T]he voluntariness of [a] plea depends on whether counsel's advice 'was within the range of competence demanded of attorneys in criminal cases.' ") (quoting *McMann v. Richardson*, 397 U.S. 759, 771 (1970)). Smith's

---

[1]This is not simply speculation. Under the proffered plea agreement, the prosecutor would have recommended a 110 year sentence if Smith pleaded guilty to two counts of deliberate homicide. Smith would have been eligible for parole after 17 and a half years. *See* Maj. Op. at 9946-47. Smith's co-defendant, Rodney Munro, accepted a similar agreement: he pleaded guilty to two counts of aggravated kidnaping — which was also a capital crime in Montana at the time — and the prosecutor recommended a 110 year sentence. Notwithstanding that recommendation, the Montana district court sentenced Munro to 60 years. Munro was released on October 10, 1998.

SMITH V. MAHONEY                    9977

guilty plea should not have been accepted by the Montana district court.

### A. The Correct Question is Whether Smith Would Have Gone to Trial, Not Whether a Jury Would Have Found Him Not Guilty

The majority concludes that the assistance provided by Smith's attorney, Doran, "fell below an objective standard of reasonableness." *Strickland v. Washington*, 466 U.S. 668, 688 (1984). But they excuse Doran's many failures because they find that Smith was not prejudiced. *Id.* at 692 ("[A]ny deficiencies in counsel's performance must be prejudicial to the defense in order to constitute ineffective assistance under the Constitution."). That holding is apparently based on their view that it is not "likely" that any of the affirmative defenses that Smith could have raised at trial would have been successful. *See* Maj. Op. at 9957. By focusing on Smith's defenses, the majority implicitly finds no prejudice because, had he gone to trial, a jury would have found him guilty.

But Smith need not prove so much. Prejudice in this case is not measured by the possibility of a not-guilty outcome, but rather the possibility that he would not have sacrificed his constitutional right to a trial. When a petitioner claims ineffective assistance during the plea bargaining process, he "must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Hill v. Lockhart*, 474 U.S. 52, 59 (1985). A reasonable probability is "a probability sufficient to undermine confidence in the outcome," *Strickland*, 466 U.S. at 694, but "less than the preponderance more-likely-than-not standard," *Summerlin v. Schriro*, 427 F.3d 623, 643 (9th Cir. 2005) (en banc). *See also Strickland*, 466 U.S. at 693 ("[A] defendant need not show that counsel's deficient conduct more likely than not altered the outcome in the case."). The question is not whether an affirmative defense would likely have succeeded at trial, but rather

9978                     SMITH V. MAHONEY

whether we can be confident that Smith would still have plead guilty had he known that he could have raised an affirmative defense at trial.

When deciding what probability is "reasonable," we must keep in mind that this is a capital case. Because of the high stakes involved, our confidence is more easily shaken by unreasonable errors by trial counsel. *Cf. Cox v. Ayers*, 588 F.3d 1038 (9th Cir. 2009) ("The bar for establishing prejudice is set lower in death-penalty sentencing cases than in guilt-phase challenges and noncapital cases."). As the Supreme Court explained in *Woodson v. North Carolina*, 428 U.S. 280 (1976),

> the penalty of death is qualitatively different from a sentence of imprisonment, however long. Death, in its finality, differs more from life imprisonment than a 100-year prison term differs from one of only a year or two. Because of that qualitative difference, there is a corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case.

*Id.* at 305; *see also Lockett v. Ohio*, 438 U.S. 586, 604 (1978) (plurality opinion) (requiring a "greater degree of reliability when the death sentence is imposed").[2]

---

[2]Justice Stewart explained why 'death is different' in *Furman v. Georgia*, 408 U.S. 238 (1972):

> The penalty of death differs from all other forms of criminal punishment, not in degree but in kind. It is unique in its total irrevocability. It is unique in its rejection of rehabilitation of the convict as a basic purpose of criminal justice. And it is unique, finally, in its absolute renunciation of all that is embodied in our concept of humanity.

*Id.* at 306 (Stewart, J., concurring); *see also Reid v. Covert*, 354 U.S. 1, 77 (1957) (Harlan, J. concurring); *Spaziano v. Florida*, 468 U.S. 447, 490 (1984) ("Every Member of this Court has written or joined at least one

## B. There is a Reasonable Probability that, Had Smith Known About Colorarable Defenses, He Would Have Gone to Trial

### i. Ineffective Assistance

Doran provided Smith with pitifully little assistance.[3] The greater the departure from the standard of "reasonably effective assistance," *Strickland*, 466 U.S. at 688, the greater our suspicion that the defendant was prejudiced by that departure. At the extreme end, when a lawyer effectively abandons the defendant during a critical stage of the proceedings, his or her ineffective assistance amounts to constructive denial of the defendant's right to counsel and prejudice is presumed. *See Roe v. Flores-Ortega*, 528 U.S. 470, 482 (2000) (noting that there are situations in which, based on the "magnitude of the deprivation of the right to effective assistance of counsel," prejudice can be presumed); *Vansickel v. White*, 166 F.3d 953, 962 (9th Cir. 1999). We assume prejudice because, "if counsel entirely fails to subject the prosecution's case to meaningful adversarial testing," the entire process is unreliable. *United States v. Cronic*, 466 U.S. 648, 659 (1984).[4]

---

opinion endorsing the proposition that because of its severity and irrevocability, the death penalty is qualitatively different from any other punishment, and hence must be accompanied by unique safeguards to ensure that it is a justified response to a given offense.") (Stevens, J., dissenting in part).

[3]It warrants noting that Doran had never worked on a capital case before. *See Hamilton v. Ayers*, 583 F.3d 1100, 1114 (9th Cir. 2009) (finding ineffective assistance where defense counsel had never worked on a capital case before and failed to associate co-counsel).

[4]Constructive denial has been found, for example, where an attorney forgot to file a notice of appeal, *Lozada v. Deeds*, 498 U.S. 430, 432 (1991), conceded that there was no reasonable doubt as to defendant's guilt, *United States v. Swanson*, 943 F.2d 1070, 1074 (9th Cir. 1991), and slept through a substantial portion of the trial, *Javor v. United States*, 724 F.2d 831 (9th Cir. 1984).

   While it is not fair to say that Doran did absolutely nothing
prior to Smith pleading guilty, it is fair to say that he "entirely
fail[ed] to subject the prosecution's case to meaningful adver-
sarial testing," *Id.* at 659. His time records show that, prior to
Smith's plea, he spent "0" hours on investigation and 6.3
hours on research. He received a list of 35 potential witnesses
from the state. He interviewed only four or five of them, pre-
ferring instead to rely on state prosecuting attorney Ted Lum-
pus for information about how the witnesses would testify.
*See Hamilton v. Ayers*, 583 F.3d 1100, 1114 (9th Cir. 2009)
(finding ineffective assistance where the defense "investiga-
tion consisted of at most five interviews"). He did not hire an
investigator or visit the scene of the crime himself, figuring
the facts at issue were not "particularly complicated" and
trusting Smith's account of the crime. *Cf. Powell v. Ala.*, 287
U.S. 45, 58 (1932) (presuming prejudice where "[n]o attempt
was made to investigate.").

   Doran also did nothing to explore possible affirmative
defenses. He had conversations with Smith about his back-
ground, where he learned about Smith's psychological prob-
lems and drug use. But he never sought Smith's mental
health, educational, or corrective records. *See Porter v.
McCollum*, 130 S. Ct. 447 (2009) (per curiam) (holding that
counsel was deficient for failing to obtain any school, medi-
cal, or military records, or otherwise to investigate the defen-
dant's mental health and background). Though Smith's "hope
for his own execution should have raised alarms," *Burt v.
Uchtman*, 422 F.3d 557, 568 (7th Cir. 2005), Doran never
asked for a psychiatric evaluation. By his own admission,
Doran did not discuss any viable affirmative defenses with
Smith.

   Furthermore, Doran knew that Smith wanted to die because
he was suffering from deep depression caused by living in
solitary confinement, where he was denied fresh air, sunlight,
and exercise. Doran also knew that Smith had received "nu-
merous death threats" from Native American inmates and that

SMITH v. MAHONEY                                9981

he believed it was better to be executed than killed in prison.
While these pressures perhaps did not render Smith incompe-
tent, they clearly did impair his "ability to make adequately
considered decisions in connection with [his] representation."
Model Rules of Professional Conduct Rule 1.14 (1983). When
a client "cannot adequately act in [his] own interest," his law-
yer is obligated to take "protective action." *Id.*; *see also*
Model Code of Professional Responsibility EC 7-12 (1980).
At a minimum, Doran should have requested that Smith be
moved to a different cell, asked prison guards to take mea-
sures to prevent Smith from being attacked by other inmates,
and assured Smith that he would be protected. It was Doran's
responsibility to ensure that Smith's decision to plead guilty
and seek death was based on a clear understanding of the evi-
dence against him and possible defenses. Instead, Smith's
guilty plea was the product of fear and abject despair.

The record clearly demonstrates that, once Smith told
Doran that he wanted to plead guilty and seek the death pen-
alty, Doran gave up on him. Although his ineffective assis-
tance was not absolutely "complete," and perhaps does not
warrant a presumption of prejudice, *Bell v. Cone*, 535 U.S.
685, 697 (2002), it came extremely close.

### ii.    Prejudice

Notwithstanding Doran's alarmingly poor performance, the
majority finds no prejudice to Smith because they believe that
it is unlikely that a voluntary intoxication or mitigated homi-
cide defense would have succeeded at trial. *See Hill v. Lock-
hart*, 474 U.S. 52, 59 (1985) (identifying the probable success
of potential affirmative defenses as one factor in the prejudice
inquiry). There was evidence that Smith had been drinking
heavily the day of the murders and using large quantities of
LSD around that time, which was relevant to the question of
whether Smith "purposely or knowingly" committed the mur-
ders. Mont. Code Ann. § 45-5-102 (deliberate homicide);
Mont. Code Ann. § 45-2-203 (1985) (voluntary intoxication).

9982                    SMITH V. MAHONEY

There was also evidence to support a mitigated homicide defense, as Smith was emotionally disturbed at the time of the crimes. Mont. Code Ann. § 45-5-103.

To support their conclusion that these defenses would have been unsuccessful, the majority points to Smith's first plea hearing, where he testified that he was "of a cold and calculating mind" when he killed Running Rabbit and Mad Man, and also told the judge that he "had a kind of morbid fascination to find out what it would be like to kill somebody." *See* Maj. Op. at 9959, 9961. He gave this testimony in response to the sentencing judge's question of why he thought he deserved the death penalty. Had Doran properly advised Smith, Smith would have pleaded not guilty and would have remained silent at the plea hearing. *See, e.g., Moore v. Czerniak*, 574 F.3d 1092, 1109-1114 (9th Cir. 2009) (gauging prejudice by considering the evidence the state would have offered had defense counsel not erred by failing to block introduction of defendant's illegally obtained confession); *Strickland v. Washington*, 466 U.S. 668, 689 (1984) ("A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight . . . ."). Smith's incriminating testimony was the direct result of his attorney's errors; that testimony cannot be used to prove what would have happened absent those errors.[5]

No one can know for certain whether Doran could have persuaded a jury on either a mitigated homicide or voluntary intoxication theory, but we do know that he could have marshaled enough evidence that the jury would have had to consider those defenses. *See State v. Gone*, 587 P.2d 1291 (Mont. 1978) (voluntary intoxication defense put to a jury despite

---

[5]Even if his testimony could be taken into account, it should not be given any weight; at the re-sentencing hearings on May 3, 1983, and December 1, 1983, Smith admitted that he exaggerated his testimony at the first plea hearing in order to improve his chances of being sentenced to death.

overwhelming evidence showing intent); *State v. Buckley*, 557 P.2d 283, 285 (Mont. 1976) (mitigated homicide defense must be put to a jury if there is any evidence of extreme mental or emotional stress). Because Smith had colorable defenses to deliberate homicide, he would have been entitled to jury instructions on those defenses.

Even were we to assume that it is unlikely that a jury would have been persuaded by a voluntary intoxication or mitigated homicide theory, there would still be a reasonable probability that Smith would have gone to trial had he known about them. This is not a case, like *Hill*, where the defendant risked forfeiting a favorable plea agreement by going to trial. Smith had nothing to lose. He could plead guilty to deliberate homicide and possibly be sentenced to death. Or he could plead not guilty and possibly be sentenced to death — or perhaps be found ineligible for the death penalty, if the jury decided he was guilty of the lesser crime of mitigated deliberate homicide on account of intoxication or emotional stress. The benefits of going to trial must be weighed against the costs, and here there were none. The majority loses sight of this fact because they focus on the question of whether Smith would have been found not guilty, instead of whether he would have gone to trial.

Smith should have pleaded not guilty if there was *any* chance a voluntary intoxication or mitigated deliberate homicide defense would have succeeded, and we cannot say for sure that those defenses were futile. *Cf. Roe v. Flores-Ortega*, 528 U.S. 470, 485 (2000) (holding that "evidence that there were nonfrivolous grounds for appeal . . . will often be highly relevant" in determining whether appellant was prejudiced by counsel's failure to file a notice of appeal). Therefore, there is a reasonable probability that Smith would have insisted on going to trial had Doran advised him adequately.

9984        SMITH v. MAHONEY

### C.    Smith's Hope for the Death Penalty Should Not be Decisive

"The fact that overshadows this case" is that Smith told the sentencing judge that he wanted to be executed. *Langford v. Day*, 110 F.3d 1380, 1386 (9th Cir. 1997). In *Langford*, we held that, where a defendant was "determined and unequivocal in his decision to plead guilty and seek the death penalty," he could not have been prejudiced by his counsel's failure to adequately assist him during plea proceedings. *Id.* at 1388.[6] Langford truly was adamant that he be executed. He persisted in that decision through two months of psychiatric evaluation at a hospital; followed by two more months of frequent meetings with his attorney, who tried to change his mind; through sentencing, where he did not present any mitigating evidence; and even after he was sentenced to death, when he chose not to appeal. *Id.* 1383-84.

By contrast, Smith was not nearly so persistent in his death wish. He pleaded guilty on February 24, 1983, and was sentenced to death on March 21, 1983. He changed his mind "shortly thereafter" and submitted a motion for re-sentencing on April 11, 1983. It took less than three weeks for him to decide that he did not want to die, which strongly suggests that he was not so resolute as Doran claimed to believe. At the re-sentencing hearings on May 3, 1983, and December 1, 1983, Smith testified that he had changed his mind because he had been transferred to better prison conditions — a transfer

---

[6]The majority also cites *Lambert v. Bloggett*, 393 F.3d 943 (9th Cir. 2004), for the proposition that prejudice does not exist where a defendant chooses to plead guilty. *See* Maj. Op. at 9961. In *Lambert*, the Ninth Circuit did not hold that a defendant's wish to plead guilty was dispositive of prejudice, only that the Washington state court's holding that there was no prejudice because the defendant plead guilty for his own reasons was not "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." *Id.* at 980. Accordingly, AEPDA required deference to the state court. AEPDA does not apply here.

SMITH v. MAHONEY                    9985

that Doran should have sought *before* Smith plead guilty. *See supra* at 3490-91. Accordingly, we cannot be as confident as the court in *Langford* that Smith would not have changed his mind and decided to proceed to trial had Doran provided adequate assistance.[7]

Smith's decision to plead guilty and seek the death penalty was itself a symptom of Doran's ineffective assistance. *See Comer v. Schriro*, 480 F.3d 960, 966 (9th Cir. 2007) (en banc) (Paez, J., concurring) (emphasizing that panel was allowing capital defendant to voluntarily dismiss his appeal because defendant had been fully advised as to the viability of his legal claims); *McMann v. Richardson*, 397 U.S. 759, 767 (1970) (suggesting that counsel's ineffectiveness during plea proceedings is not prejudicial where "defendant has his own reasons for pleading guilty *wholly aside* from the strength of the case against him") (emphasis added). While that decision perhaps should be given a measure of deference, *Summerlin v. Stewart*, 267 F.3d 926 (9th Cir. 2001), that decision should not be decisive because it was not knowing and intelligent, *Jeffries v. Blodgett*, 5 F.3d 1180, 1198 (9th Cir. 1993).

It is hard to escape the fact that we would not be here if Smith had not succumbed to his semi-suicidal thoughts and instead had accepted the plea bargain offered by the Flathead County Attorney, which would have required him to plead guilty in exchange for a 110 year sentence. That decision — and the twenty-seven years of litigation it triggered — was the product of Doran's inadequate assistance. I would find prejudice.

---

[7]Surprisingly, death penalty "volunteers" like Smith and Langford are not uncommon. According to one study, approximately 12% of those executed between 1977 and 2003 have been willing volunteers. *See* John H. Blum, *Killing the Willing: "Volunteers," Suicide and Competency*, 103 Mich. L. Rev. 939, 939-940 (2005). Less surprisingly, defendants who initially "volunteer" frequently change their minds. Richard J. Bonnie, *Mentally Ill Prisoners on Death Row: Un-solved Puzzles for Courts and Legislatures*, 54 Catholic U. L. Rev. 1169, 1189-92 (2004-2005).

9986                    Smith v. Mahoney

## II.  *The Court Should Hear and Grant Smith's* Lackey *Claim*

The majority holds that *Teague v. Lane*, 489 U.S. 288 (1989), prevents us from recognizing a new Eighth Amendment claim for prisoners who have spent a very long time on death row. The Supreme Court in *Teague* did bar courts from announcing new rules of constitutional law on habeas review, 489 U.S. at 316, but it also provided for two exceptions. *Teague* does not apply where the new rule is one that (1) "places certain kinds of primary, private individual conduct beyond the power of the criminal law-making authority to proscribe" or (2) "requires the observance of those procedures that . . . are implicit in the concept of ordered liberty." *Id.* at 307.

The first exception clearly applies here. *See Penry v. Lynaugh*, 492 U.S. 302, 330 (1989), *aff'd and rev'd on other grounds*, 532 U.S. 782 (2001). The Supreme Court in *Penry* explained why *Teague* did not prevent it from holding that the Eighth Amendment prohibits the execution of mentally retarded persons:

> In our view, a new rule placing a certain class of individuals beyond the State's power to punish by death is analogous to a new rule placing certain conduct beyond the State's power to punish at all. In both cases, the Constitution itself deprives the State of the power to impose a certain penalty. . . . Therefore, the first exception set forth in *Teague* should be understood to cover not only rules forbidding criminal punishment of certain primary conduct but also rules prohibiting a certain category of punishment for a class of defendants because of their status or offense.

*Id.* at 329-30. *Cf. Ford v. Wainwright*, 477 U.S. 399, 409-10 (1986) (declaring a defendant who had become insane since

his conviction ineligible for the death penalty on Eighth Amendment grounds). By the same logic, *Teague* does not prevent this court from holding that execution after a long tenure on death row violates the Eighth Amendment. The court may reach the merits of Smith's *Lackey* claim.

We have always found a way to avoid addressing *Lackey* claims on the merits, usually by invoking AEPDA's bar against second or successive petitions. *See, e.g.*, *Allen v. Ornoski*, 435 F.3d 946, 948 (9th Cir. 2006); *LaGrand v. Stewart*, 170 F.3d 1158, 1160 (9th Cir. 1999); *Gerlaugh v. Stewart*, 167 F.3d 1222, 1223 (9th Cir. 1999); *Ortiz v. Stewart*, 149 F.3d 923, 944 (9th Cir. 1998); *but see McKenzie v. Day*, 57 F.3d 1461, 1467 (9th Cir. 1995) (declining to stay execution because it was "highly unlikely that McKenzie's *Lackey* claim would be successful if litigated to its conclusion."). AEPDA does not apply here, *see* Maj. Op. at 9952, and neither does *Teague*. We are out of excuses.

There is a strong case to be made that long stays on death row violate the Eighth Amendment.[8] As I explained more fully in my dissent to the denial of the stay in *Ceja v. Stewart*, 134 F.3d 1368 (1998), the Supreme Court has made clear that "the imposition of the death penalty must serve legitimate and substantial penological goals in order to survive Eighth Amendment scrutiny," and it must serve those goals more effectively than a less severe punishment. *Id.* at 1370 (B.

---

[8]*See Johnson v. Bredesen*, 130 S. Ct. 541, 542 (2009) (Stevens, J., dissenting from denial of cert.) ("[M]y strongly held view [is] that state-caused delay in state-sponsored killings can be unacceptably cruel."); *Knight v. Florida*, 528 U.S. 990, 993 (1999) (Breyer, J., dissenting from denial of cert) ("Where a delay, measured in decades, reflects the State's own failure to comply with the Constitution's demands, the claim that time has rendered the execution inhuman is a particularly strong one."); *Elledge v. Florida*, 525 U.S. 944 (1998) (Breyer, J., dissenting from denial of cert); *Lackey v. Texas*, 514 U.S. 1045, 1045 (1995) (Stevens, J., dissenting from denial of cert.) ("Though novel, petitioner's claim is not without foundation.").

Fletcher, J., dissenting) (citing *Gregg v. Georgia*, 428 U.S. 153, 183 (1976)). Specifically, a capital sentence may be imposed when it is the only way to express "society's moral outrage at particularly offensive conduct" and functions as an effective deterrent. *Id.* Where the death penalty

> ceases realistically to further these purposes . . . its imposition would then be the pointless and needless extinction of life with only marginal contributions to any discernible social or public purpose. A penalty with such negligible returns to the State would be patently excessive and cruel and unusual punishment violative of the Eighth Amendment.

*Furman v. Georgia*, 408 U.S. 238, 312 (1972) (White, J., concurring).

Smith has suffered 27 years on death row, living in solitary confinement and under the constant threat of execution. *See Furman v. Georgia*, 408 U. S. 238, 288 (1972) (Brennan, J., concurring) ("[T]he prospect of pending execution exacts a frightful toll during the inevitable long wait between the imposition of sentence and the actual infliction of death."); *In re Medley*, 134 U.S. 160, 172 (1890) (waiting for an execution without knowing when it is to take place is "one of the most horrible feelings to which [a person] can be subjected"). Executing Smith after all this time would go far beyond what is necessary to satisfy society's moral outrage over his horrible crimes. It is hard to see how Smith's execution today would have any deterrent effect. *See Furman*, 408 U.S. at 302 (Brennan, J., concurring) ("[The] validity [of the death penalty] depends upon the existence of a system in which the punishment of death is invariably and swiftly imposed."). Executing Smith would not advance the purposes underlying the death penalty, and thus would violate the Eighth Amendment.

Because I would find that Smith has proven ineffective assistance of counsel and a *Lackey* violation, I would grant the petition for habeas corpus.